SCOTT et al. v. TOWNSEND et al.

(Court of Civil Appeals of Texas. · Ft. Worth. March 22, 1913. On Motion for Rehearing, May 10, 1913.)

1. WILLS (§ 282*)—FORM AND ALLEGATIONS—MATTERS OF EVIDENCE.

A petition, alleging that testator was unduly influenced by contestee, his wife, to discriminate between his children in a manner favorable to his son and unfavorable to his daughter, the contestant, was not objectionable on the ground that it failed to show in what such undue influence consisted or the facts and circumstances relied on as a basis for recovery, since contestant was not required to plead her evidence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 640; Dec. Dig. § 282.*]

2. APPEAL AND ERROR (§ 1040*)—REVIEW—HARMLESS ERROR—RULING ON APPEAL.

Where contestees did not claim to be surprised by the evidence offered to sustain the allegations of undue influence, nor unprepared to meet the same, error, if any, in overruling an exception to the petition on the ground that it did not disclose facts and circumstances on which the undue influence was sought to be established, was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4089–4105; Dec. Dig. § 1040.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

**3. APPEAL AND ERROR (§ 1040*)—HARMLESS ERROR — PLEADING — PARTICULAR ALLEGATIONS.**

In a will contest, where there was no evidence to sustain the contestant's allegation that the contestee had procured the execution of the will by fraudulently agreeing with testator that she would execute a will, which she had failed to do, and the court charged that the only issue to be considered was that of undue influence, the refusal to sustain exceptions to the allegations as to such agreement was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4089–4105; Dec. Dig. § 1040.*]

**4. APPEAL AND ERROR (§ 1067*)—HARMLESS ERROR—PLEADING—ISSUES.**

In a will contest, where there was no evidence to sustain contestant's allegation of testamentary incapacity, and where the jury were expressly directed to consider only the issue of undue influence, the refusal to instruct not to consider the allegations of testamentary incapacity was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4229; Dec. Dig. § 1067;* Trial, Cent. Dig. § 475.]

**5. APPEAL AND ERROR (§ 730*)—ASSIGNMENTS OF ERROR—SPECIFICATION OF ERROR.**

Assignments of error, in that the court erred in its charge defining undue influence, that it was not a correct statement of the law thereon and was misleading, and in that it erred in so defining undue influence as to be inapplicable to the facts, suggesting features not raised by the evidence, were too general for consideration, since they neither pointed out the inaccuracy nor the features of undue influence not raised by the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3013–3016; Dec. Dig. § 730.*]

**6. WILLS (§ 155*) — VALIDITY — "UNDUE INFLUENCE."**

"Undue influence" means substantially such power or control of the mind and conduct of one person by another as in some measure destroys the free agency of the person upon whom such influence is exercised, and prevents the exercise of that discretion which the law requires of a testator when executing his will; it may consist of any improper or wrongful constraint, coercion, or persuasion whereby the will of testator is overpowered and free agency destroyed.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172.]

**7. WILLS (§ 332*)—CONTEST—INSTRUCTIONS—UNDUE INFLUENCE.**

Where the court, in a will contest in defining undue influence, explained that it must be such influence as to destroy free agency and prevent the exercise of his own will, an instruction to find for contestant if testator executed the will while under and subject to the undue influence of the contestee was not erroneous in not requiring a finding that such undue influence caused him to make the will, and that but for it he would have made a different will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 785; Dec. Dig. § 332.*]

**8. APPEAL AND ERROR (§ 730*)—ASSIGNMENTS OF ERROR—SPECIFICATION OF ERRORS.**

Assignments of error, in that the charge in a will contest submitted an issue neither pleaded nor proven, but not pointing out the difference between the issues referred to, was too general to merit consideration.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3013–3016; Dec. Dig. § 730.*]

**9. WILLS (§ 332*)—CONTEST—INSTRUCTIONS—CONFORMITY TO PLEADING AND ISSUES.**

In a will contest where the only material issue was that of undue influence, a charge defining undue influence and declaring that if the testator executed the will in evidence while under the undue influence of contestee, his wife, in making the disposition therein contained, there should be a verdict for contestant, but that if it was otherwise the verdict should be for contestee, was sufficiently definite to confine the jury to the one material issue of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 785; Dec. Dig. § 332.*]

**10. WILLS (§ 164*)—CONTEST—ADMISSIBILITY OF EVIDENCE.**

In an action to set aside a will on the ground of contestee's undue influence upon the testator, her husband, whereby the contestant, a daughter, was alleged to have received a smaller share than she otherwise would have received, evidence of a conversation between testator and contestee, to the effect that the daughter was married and that contestee knew that he would cut her off as he had promised to do, and never have anything more to do with her, was admissible on the issue of undue influence, as it tended to show an effort on the part of the contestee to obtain a will excluding the contestant from any share in his estate; and evidence that, on a trip abroad shortly before the execution of the will, it was discussed, and that it was a common practice of the contestee to threaten to take their minor son away from testator to induce him to comply with her wishes in other matters, in connection with the fact that the execution of his will was the first business attended to by testator on his return, was admissible to show that its execution had been discussed, and evidence that contestee had said to testator that she did not think the contestant ought to have anything was also admissible as showing an effort to exclude the contestant from participation in his estate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

**11. WILLS (§ 164*)—UNDUE INFLUENCE—ADMISSIBILITY OF EVIDENCE—HOSTILE FEELING TOWARD CONTESTANT.**

In an action to set aside a will on the ground of contestee's undue influence upon the testator, her husband, to the alleged exclusion of contestant, a daughter, from any material part of the estate, evidence of a conversation, in which contestee expressed the hope that testator would never have anything more to do with the daughter and stated that they could not get along, that contestee, on testator's suggestion that his daughter accompany them on a trip abroad, said she would not go if the daughter went, and that when the daughter asked to be taken home from school the contestee said that she could not come, and that she would not be bothered with her, was admissible as tending to show that contestee entertained hostile feelings toward the daughter.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

**12. APPEAL AND ERROR (§ 1051*)—REVIEW—HARMLESS ERROR—IMPROPER JUDGMENT.**

Under the express provision of Rule 62a for Courts of Civil Appeals (149 S. W. x), any error in the admission of evidence upon the issue, which in view of the other evidence tending to establish the issue was not calculated

to·cause the rendition of an improper judgment, does not require a reversal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4170; Dec. Dig. § 1051.*]

13. EVIDENCE (§ 145*) — MATERIALITY — REMOTENESS.

Where the evidence for a contestant of her father's will on the ground of undue influence formed a part of a chain of circumstances showing a purpose on the part of the contestee, of long standing and continuously pursued, to induce testator to exclude her from a share in his estate, it was not objectionable for remoteness.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 434; Dec. Dig. § 145.*]

14. WILLS (§ 165*)—UNDUE INFLUENCE—ADMISSIBILITY OF EVIDENCE — DECLARATIONS OF TESTATOR.

In a will contest on the ground of undue influence by contestee, the wife of testator, whereby contestant, his daughter by a former marriage, was excluded from any material participation in the estate, declarations of the testator, in the absence of contestee, consisting in whole or in part of acts indicative of affection for the daughter, were admissible as tending to show the state of his mind at the time of making his will, after efforts to that end had been established by other evidence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 415–420; Dec. Dig. § 165.*]

15. EVIDENCE (§ 121*)—RES GESTÆ—DECLARATIONS AS TO FEELINGS AND INTENTIONS.

Physical suffering, intentions, ill feelings, affection, and other emotions, when they are material circumstances to establish an issue, may be established by proof of declarations contemporaneous with such intentions or feelings, as a part of the res gestæ.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 303, 307–338, 1117, 1119; Dec. Dig. § 121.*]

16. TRIAL (§ 85*)—RECEPTION OF EVIDENCE—OBJECTIONS — EVIDENCE ADMISSIBLE IN PART.

Where evidence is admissible in part, an objection to it as a whole cannot be sustained.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 222, 223–225; Dec. Dig. § 85.*]

17. WILLS (§§ 160, 165*)—CONTEST—ADMISSIBILITY OF EVIDENCE—REVOCATION.

The fact that a will was never revoked, although testator lived more than two years after its execution, was a circumstance tending to refute the contention of contestant that its execution was the result of undue influence; and, to refute this circumstance, the declarations of testator, made after the will was executed, tending to show the same affection and testamentary intentions toward his daughter as he entertained before its execution, were admissible to show that the previous efforts of the contestee to unduly influence him were still operating upon his mind, and but for that he would have revoked the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 372, 373, 415–420; Dec. Dig. §§ 160, 165.*]

18. TRIAL (§ 85*)—RECEPTION OF EVIDENCE—OBJECTIONS — EVIDENCE ADMISSIBLE IN PART.

In a will contest on the ground of undue influence by contestee upon the testator, her husband, evidence of declarations of the contestee of ill feeling toward the contestant, or of an intention to induce testator to exclude her from a share in his estate, were properly

admitted, where objection was made to them as a whole, and they were competent in part.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 222, 223–225; Dec. Dig. § 85.*]

19. EVIDENCE (§ 226*) — DECLARATIONS OF DEVISEE — INTERESTS OF OTHER BENEFICIARIES.

While declarations of a legatee are not admissible, as against other legatees, to prove that the execution of the will was procured by undue influence, yet, where a contestee charged with undue influence denied all the conversations between herself and her husband, the testator, declarations of contestee, showing that she entertained ill will toward contestant, and had an intention to induce testator to exclude her from a participation in his estate, although made in the absence of the testator, were admissible in corroboration of evidence to show such conversations.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 815–821; Dec. Dig. § 226;* Wills, Cent. Dig. § 135.]

20. EVIDENCE (§ 222*)—ADMISSIONS—WILLS.

In a will contest on the ground of undue influence of the contestee over the testator, her husband, declarations of the contestee that contestant, who was testator's daughter, need not be looking to see what she could get out of testator because declarant would see that she did not get any more than she had were admissible, as tending to show her influence upon testator's mind at the time he executed his will.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 786–800, 803–808; Dec. Dig. § 222.*]

21. EVIDENCE (§ 145*) — MATERIALITY — REMOTENESS.

Declarations of contestee previous to the execution of his will by testator, her husband, showing an ill feeling and hostile intention toward contestant, his daughter, were not objectionable for remoteness, in view of other evidence tending to show a continuation of the same feelings and intentions up to and after the execution of the will.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 434; Dec. Dig. § 145.*]

22. WILLS (§ 324*)—CONTEST—QUESTION FOR JURY—UNDUE INFLUENCE.

On the evidence in a will contest on the ground of undue influence by contestee upon testator, her husband, whereby contestant, a daughter, was excluded from any material participation in the estate, *held* the contestant's evidence amounted to more than a mere scintilla of proof and that the question of undue influence was for the jury.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 225, 767–770; Dec. Dig. § 324.*]

On Motion for Rehearing.

23. WILLS (§ 165*) — EVIDENCE — DECLARATIONS OF TESTATOR—UNDUE INFLUENCE.

In a will contest on the ground of undue influence upon the testator, whereby contestant, a daughter, was excluded from any material participation in the estate, testimony of a witness that testator declared that contestee, his wife, desired him to make a will was not within the hearsay rule, but was admissible as showing his state of mind and the effect upon his mind of the alleged undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 415–420; Dec. Dig. § 165.*]

24. APPEAL AND ERROR (§ 930*)—PRESUMPTIONS—AID TO JUDGMENT.

In the absence of anything in the record to indicate that the jury did not obey the court's instruction that a declaration could not

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

be considered as evidence of the truth, but only as bearing upon the state of testator's mind, it will be presumed that the jury applied the charge to the facts, so that under rule 62a for Courts of Civil Appeals (149 S. W. x), forbidding reversal for error at the trial not calculated to cause an improper judgment, error, if any, in its admission was not ground for reversal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3755–3761; Dec. Dig. § 930.*]

25. WILLS (§ 166*) — VALIDITY — UNDUE INFLUENCE—EVIDENCE.

In a will contest, evidence *held* to sustain a finding that the execution of the will was procured by undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

Appeal from District Court, Tarrant County; R. H. Buck, Judge.

Will contest by Mrs. Georgia Scott Townsend and others against Mrs. Elizabeth Scott and others. From a judgment of the district court, on appeal from the county court, setting aside the probate, contestees appeal. Affirmed.

Capps, Cantey, Hanger & Short, A. J. Clendenen, and Stephens & Miller, all of Ft. Worth, for appellants. McLean, Scott & McLean and Spoonts, Thompson & Barwise, all of Ft. Worth, for appellees.

DUNKLIN, J. On January 2, 1912, an instrument in writing bearing date September 29, 1909, executed by Winfield Scott, now deceased, and duly attested by two subscribing witnesses, was admitted to probate in the county court of Tarrant county as the last will and testament of the deceased. The application for the probate of the instrument was filed by A. B. Robertson and Mrs. Elizabeth Scott, surviving wife of the deceased, who were named in the will as executor and executrix, respectively. On the same day the will was probated A. B. Robertson and Mrs. Elizabeth Scott were appointed independent executors of the will without bond, and appraisers were appointed to appraise the property belonging to the estate. No opposition was offered to these proceedings, but Mrs. Georgia Scott Townsend, daughter of the deceased, joined pro forma by her husband, John R. Townsend, instituted a suit in the county court against Mrs. Elizabeth Scott, A. B. Robertson, Winfield Scott, Jr., a minor, and Winfield Scott Townsend, minor son of Mrs. Georgia Scott Townsend, to set aside the order probating the will and to annul the will. In their first amended original petition filed March 15, 1912, they alleged that the execution of the purported will was procured by undue influence upon the testator, exerted by Mrs. Elizabeth Scott, hereinafter designated contestee, and upon the further ground that at the time of the execution of the will the testator was mentally incapable of appreciating and understanding the force and effect of the instrument. A guardian ad litem was appointed for each of the minor defendants. The defendants Mrs. Elizabeth Scott and A. B. Robertson and the guardian ad litem for Winfield Scott, Jr., filed a general demurrer and general denial to the petition. The guardian ad litem for defendant Winfield Scott Townsend entered his appearance with the allegation that he was not sufficiently informed in the premises to answer the merits of the cause, and therefore submits all matters in controversy to the court with the prayer that such orders be made as law and equity may direct. On March 16, 1912, the suit was tried in the county court, and judgment was there rendered that the plaintiffs take nothing. Plaintiffs excepted to the judgment and prosecuted an appeal to the district court of Tarrant county. In that court plaintiffs filed their third amended original petition on May 28, 1912, praying for the same relief as sought in their first amended original petition.

The following were the grounds, alleged in that petition for setting aside the will:

"Plaintiff avers that said pretended last will and testament of Winfield Scott, deceased, is void, not binding, and should be so declared; that the probate thereof is void, and should be annulled and set aside for these reasons, viz.: That the execution of said will was procured by Mrs. Elizabeth Scott, through undue influence exerted by her over the said Winfield Scott, and the execution of said will was a direct and immediate result of such influence so exerted by said Mrs. Elizabeth Scott over the said Winfield Scott, and operating on and controlling him at the very time of the execution of such will, in this, to wit: That the said will did not and does not represent the wish, desire, judgment, or will of the said Winfield Scott as to the disposition of his said estate, but does represent the wish, desire, and will of the said Mrs. Elizabeth Scott; that he did not execute the said will voluntarily and as his free and willing act, but was compelled, required, driven, and morally coerced to execute the same through the undue influence, domination, and command of the said Mrs. Elizabeth Scott; that for the purpose of depriving the plaintiff herein of the portion of the estate of her said father which she would have received but for said will, and in order to practically disinherit her, the said Mrs. Elizabeth Scott fraudulently induced, forced, commanded, and coerced the said Winfield Scott into so executing said will; that said Winfield Scott was unable to resist or overcome the said undue influence of the said Mrs. Elizabeth Scott, as aforesaid, and as the direct and proximate result of such conduct and undue influence so brought to bear upon him, and operating on and controlling him at the time of the execution of said will, he so executed the same, when otherwise he would not have done so. And plaintiff fur-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

ther avers that in order to obtain and maintain the domestic peace with said Mrs. Elizabeth Scott, and to avoid an open and public rupture of domestic relations with her, and to escape social embarrassment and to maintain social standing, which otherwise would have been brought about, and would have occurred through and by her acts, said Winfield Scott was induced, compelled, and forced to so execute said will.

"Said Mrs. Elizabeth Scott, as a part of her plan to procure said will as it was executed, and as a part of her scheme to cut plaintiff off from her just share of her father's estate, and to deprive her of her benefits in said estate as such heir, fraudulently pretended to said Scott, and agreed with him prior to the execution of his said will as aforesaid, to herself execute a will, the particular provisions and details of which are unknown to plaintiff, but are well known to the defendants; that though so pretending and so agreeing for such purposes she nevertheless failed, refused, and omitted so to execute such will after having so induced and procured the said Winfield Scott to execute his will aforesaid. That said Mrs. Elizabeth Scott, in order to accomplish the disinheritance of plaintiff, and to prevent her from receiving her just share of the estate of her said father which she would have otherwise received, by the means and in the ways hereinbefore shown in this pleading procured said Scott so to execute his will as to make the said Winfield Scott, Jr., and herself the chief beneficiaries, and to obtain for them the great bulk of the estate of the said Winfield Scott, and thereby and in these ways aiding her to overreach said Winfield Scott, overthrow his judgment, destroy his real wish, and subvert his judgment and wishes to her own views and purposes, but for which acts and conduct of said Mrs. Elizabeth Scott plaintiff would have received a large portion of the estate of said Winfield Scott, deceased, and would have received the share thereof to which she was entitled as an heir.

"That the said Winfield Scott, at the time of the execution of said will, was in a perturbed and disordered nervous condition, which greatly preyed upon his mind, rendering him easily susceptible to the pressure so exerted upon him by the said Mrs. Elizabeth Scott, as above shown.

"That the said Winfield Scott, deceased, did not comprehend or understand the terms and provisions of the said will as aforesaid, and at the time of the execution of such will by him was not mentally capable of understanding it; that he did not understand or appreciate the manner and way in which he was disposing of and distributing his said estate, as was undertaken by the said pretended will to be done, nor was he of sufficient mental capacity to so understand. Plaintiff further avers that the said Winfield Scott, deceased, at the time of the making by him of the said will as aforesaid, on, to wit,

September 29, A. D. 1909, did not have sufficient mental capacity to make the said will."

All the defendants except the guardian ad litem for Winfield Scott Townsend filed an answer to that petition consisting of special exceptions and general denials and special pleas.

The suit was tried in the district court before a jury and on June 5, 1912, judgment was rendered setting aside the order of probate rendered by the county court and decreeing the will null and void. From that judgment the defendants A. B. Robertson and Mrs. Elizabeth Scott, both as executors and individuals, and Winfield Scott, Jr., by his guardian ad litem, have appealed.

Testator died in Ft. Worth, Tex., October 26, 1911, a little more than two years after the date of the will. During the summer of 1909 he changed his residence from Ft. Worth, Tex., to St. Louis, Mo., which was his residence at the time the will was executed. However, the will was executed at Ft. Worth during his temporary absence from St. Louis. Later he removed his residence from St. Louis, to Ft. Worth, Tex., where he continued to reside until the date of his death. Testator was married to Mrs. Elizabeth Scott in the year 1884, and the defendant Winfield Scott, Jr., was the only child born of that marriage, the date of his birth being November, 1901. That was testator's second marriage. His first marriage occurred in 1877, and his first wife died in 1878. Plaintiff, Mrs. Georgia Scott Townsend, the only child of that marriage, was born in 1878, a few weeks before the death of her mother.

One paragraph of the will contains recitals that a large part of the property then held by the testator was the community property of himself and wife, Mrs. Elizabeth Scott; that testator had theretofore caused to be transferred to her as her separate property several lots situated in the city of Ft. Worth, describing them, and which his wife now owns, of the aggregate value of more than $500,000, which had been paid for out of the funds belonging to the community estate of testator and Mrs. Elizabeth Scott. Following those recitals is a devise to Mrs. Elizabeth Scott of several other lots in Ft. Worth, specifically described.

In another paragraph it is stated that there was property belonging to the community estate of testator and his first wife, at the date of her death, of the approximate value of $20,000; that during the infancy of Mrs. Georgia Scott Townsend testator had supported, maintained, and educated her in a manner suitable to her social station, and in order to settle whatever interest she had in the estate of her mother, and as an advancement out of testator's estate, testator had given his said daughter lots 8 and 16 in block B—7 Daggett's addition to the city of Ft. Worth, and a home in Dallas, all of the value of more than $200,000, also a home in Denver, Colo., wherein Mrs. Townsend now resides,

of the value of $15,000. Following the recitals just mentioned is a devise to Mrs. Townsend of a life estate in four and a fraction lots in Ft. Worth, specifically described, with remainder over after her death to Winfield Scott Townsend, minor son of Mrs. Townsend.

Several lots in Ft. Worth, specifically described in the will, together with all lands then owned and thereafter to be acquired by the testator situated outside of the limits of the city of Ft. Worth, and in Tarrant, Johnson, and Parker counties, constituting testator's ranch, are devised to Winfield Scott, Jr.

To A. B. Robertson, executor named in the will, is bequeathed $10,000, as compensation for services to be performed by him in carrying out the provisions of the will, to be paid out of the residue of the estate. All indebtedness owing by the testator at the date of his death, together with the expenses of the execution of the will, are directed to be paid out of the residue of the estate, after applying to such indebtedness all life insurance to be left by the testator at his death, and the balance remaining of such residue of the estate is devised and bequeathed to Mrs. Elizabeth Scott.

All devises and bequests to Mrs. Elizabeth Scott are of absolute title, coupled with testator's request that she do not dispose of it during her life and that she devise it at her death to her son, Winfield Scott, Jr., but testator expressly disclaims any intention that the wish so expressed shall operate as a precatory trust of the devises so made to his wife, with the further statement that he has absolute and perfect confidence in her.

It is further provided in the will that should any of the devisees contest or seek to invalidate the will, or any of the provisions thereof, he or she shall forfeit all claims and right to any interest in testator's estate, and the interest devised to such person or persons should then become a part of testator's residuary estate, and be disposed of according to the provisions of the will disposing of such residue.

It is further provided in the will that should Mrs. Georgia Scott Townsend die without leaving surviving her a child or children, then the remainder of the estate after her death and the property devised to her for life, as shown above, shall vest in such of testator's heirs at law as are living at the date of the death of Mrs. Townsend, subject to the conditions and restraints contained in the will with reference to the specific devises to such heirs at law.

It is stipulated in the will that Winfield Scott, Jr., shall not have the power to sell, convey, incumber, or mortgage any of the real estate devised to him, except the power to dispose of it by will, and that if he should die intestate without issue before he arrives at the age of 50 years, or should attempt to incumber the same, then the property so devised shall pass to the heirs of testator's body. It is further provided that Winfield Scott Townsend shall not have the power to dispose of, otherwise than by will, the remainder over to him of the property in which a life estate is devised to his mother, and that if he should die intestate and without issue, or should attempt to incumber the same, then such remainder shall pass to the heirs of testator's body.

It is further provided that no bond be required of the executors named, and that no action be had in the courts in relation to the settlement of the estate other than to probate and record the will and return an inventory and appraisement of the estate.

In the inventory and appraisement filed by the executors, the aggregate value of all the property listed, including credits in bank, amounted to approximately $2,964,624, and the claims belonging to the estate $32,855, making a total valuation of property and claims approximately $2,997,480. The inventory concludes with the following: "All of the above described property was acquired by the decedent, Winfield Scott, during his marriage with his wife, Mrs. Elizabeth Scott, and is community property of the said Winfield Scott and Mrs. Elizabeth Scott, and Mrs. Elizabeth Scott now owns an undivided one-half interest thereof, and she reserves the right to hereafter determine whether she will elect to accept under said will or to claim her said community interest. Elizabeth Scott, A. B. Robertson, Executors of the Last Will and Testament of Winfield Scott, Deceased."

The proof showed, further, that testator, at the time of his death, owed approximately $900,000, but that since his death $100,000, collected on his life insurance, which seems not to have been included in the inventory, has been applied upon that indebtness, leaving a balance due upon the indebtedness of approximately $800,000.

All the property devised by the will is shown in the inventory filed by the executors. The values placed by the appraisers upon that devised to Winfield Scott, Jr., aggregated approximately $1,675,000; that devised to Mrs. Elizabeth Scott, approximately $355,000; and that devised to Mrs. Georgia Scott Townsend, $90,000.

As soon as her mother died, Mrs. Townsend went to live with her grandparents in Missouri, and continued to reside with them until September, 1886, when her father and stepmother placed her in school in the Ursuline Convent in Dallas, Tex. She attended this school for some three years or more, after which time she lived with testator and her stepmother until she married John T. Carter in 1897. During this marriage she resided in Dallas. This marriage was contrary to the wishes of her father and stepmother, who did not learn of it until after the marriage was consummated. Mrs. Georgia Scott Townsend married her present

husband, John R. Townsend, in 1905. On March 4, 1898, she, joined by her husband, John T. Carter, executed to her father a deed reciting that at the date of the death of her mother there was property belonging to the community estate of her father and mother; that there was no administration on her mother's estate; that her father had managed and controlled the same in connection with his own, and had sold and converted it into other property and mingled it with his separate estate owned by him before his first marriage; that her father had maintained and supported her, and on March 12, 1895, had conveyed to her lots 1 and 2 in block 115 in the city of Ft. Worth fronting 50 feet on Main street, which had cost her father approximately $15,000, and upon which he was then erecting a three-story brick building and was dedicating it to her. The deed then stipulated that in consideration of the facts so recited, and in further consideration that said Winfield Scott shall proceed to the completion of said brick building, Mrs. Carter conveys to her father all other interest she may have inherited from her mother in the community estate of her father and mother, as well as in any additions thereto since her mother's death. The deed contains the further recital: "In connection with the consideration for this instrument it is understood that the said lots Nos. 1 and 2, with the building being erected thereon, is of value far in excess of the interest which the said Mrs. John T. Carter inherited from her mother. (Of course this instrument is not intended in any way to affect the interest of the said Mrs. John T. Carter as one of the heirs at law in the estate of the said Winfield Scott on his death.)"

On April 6, 1903, testator conveyed to Mrs. Carter lots 8 and 16 in block B—7 Daggett's addition to the city of Ft. Worth, fronting 50 feet on Main and Houston streets, and extending 200 feet between said streets. This property is now owned by Mrs. Townsend, and is the property situated in Ft. Worth which testator stated in the will had been given to his daughter in connection with other property in settlement of her interest in her mother's estate and as an advancement by testator. The proof showed that before testator's death this property was yielding a revenue in rentals of $1,000 per month. The consideration recited in the deed last mentioned was a deed of conveyance to testator from his daughter and her husband of lots 1 and 2 in block 115, theretofore conveyed to Mrs. Townsend by her father in 1895, as recited above, and is a part of the property devised to Winfield Scott, Jr., by the will. The proof further showed that after her first marriage testator gave to contestant a home in Dallas which cost $8,000, and later gave her another home in Colorado Springs, Colo., at a cost of $11,500, and that he also gave her from time to time money for personal expenses, automobiles, a horse and buggy, jewelry, etc.

The proof further showed that from the separate property belonging to Mrs. Elizabeth Scott, paid for out of the community estate of herself and husband, as recited in the will, she now realizes a rental of approximately $2,500 per month.

Testator was a man of robust physique, strong-willed, of good business judgment, having accumulated his entire fortune by his own efforts. At the time of the execution of his will, and at all other times up to the date of his death, he was in a normal condition of mind, and no evidence was introduced which in any manner tended to show a want of testamentary capacity at the time he executed the will. Testator, in company with his wife, son, and colored nurse, Rose Hill, took a trip to Europe during the summer of 1909, starting June 6th and returning the first part of September to St. Louis, which was then his home. After his return he took a trip to Ft. Worth, Tex., arriving in Ft. Worth about September 24, 1909, and the will was executed on the 29th of the same month. Shortly before September 29th, after his arrival in Ft. Worth, but on what date the evidence does not show, testator carried to Judge Miller, his attorney, a former will, executed in 1905, and then in force, together with a list of the property he desired to devise to each beneficiary, and employed the attorney to draft the will in question. The will was prepared in compliance with the testator's instructions, and before its execution a codicil was added to meet specific wishes of testator, and the will and codicil were both read over to him before he executed it. At the time of its execution Mrs. Elizabeth Scott was in St. Louis, and she did not return to Ft. Worth until the following January. The last illness of testator was of about three weeks' duration. Mrs. Townsend was not informed of the illness of her father until she received a telegram from Mr. Cramer, testator's private secretary, on the day her father died, which was sent to her during the night of the preceding day at Denver, and forwarded from there to Kansas City, where Mrs. Townsend was then visiting. During his last illness testator called for his daughter, but according to the testimony of Mrs. Elizabeth Scott the reason Mrs. Townsend was not sooner notified of her father's illness was due to the assurances by the attending physician that testator's illness was not of a serious import, and the attending physician also testified that he did so advise Mrs. Scott.

[1, 2] Appellants excepted specially to the allegations contained in the plaintiff's petition of undue influence exercised by Mrs. Elizabeth Scott upon the testator, on the ground that the same failed to show in what such undue influence consisted, or how or when it was exerted, and fails to disclose facts and circumstances relied on as a basis

for recovery. The pleading to which the exception was addressed is set out above. That testator was unduly influenced by Mrs. Scott to discriminate between his children in the disposition of his property in a manner so favorable to his son and so unfavorable to his daughter was the material issue of fact alleged as a basis for recovery. It is difficult to perceive how plaintiff could have been compelled to plead the facts and circumstances relied on to support that allegation without violating the rule that the pleader is not required to plead his evidence. Sutor v. Wood, 76 Tex. 403, 13 S. W. 321. At all events, appellants do not claim that they were surprised by the evidence offered to sustain the allegations mentioned; nor that they were unprepared to fully controvert the same with rebutting proof; hence, if there was error in overruling the exception, the same would constitute no cause for a reversal of the judgment.

[3,4] In the court's charge the jury were expressly instructed that the only issue submitted for their determination was that of undue influence. No evidence was offered to sustain plaintiff's allegation that Mrs. Scott procured the execution of the will by fraudulently agreeing with testator herself to execute a will, which she failed to do. Nor was there any testimony tending to show a lack of testamentary capacity in the testator. Under the circumstances stated no harm resulted to appellants from the court's refusal to sustain their exceptions to the allegation setting up said agreement, on the part of Mrs. Elizabeth Scott, to execute a will, and in failing to give appellants' requested instruction not to consider any allegations in the petition to the effect that Winfield Scott lacked testamentary capacity at the time of the execution of the will.

[5, 6] The court charged the jury as follows:

" 'Undue influence' as that term is used in this charge, which is the only issue submitted for your consideration, means such power or control of the mind and conduct of one person by another as in some measure destroys the free agency of the person upon whom such influence is exercised, and prevents the exercise of that discretion which the law requires a party should possess at the time of the execution of his will. It consists of such influence, overpersuasion, coercion, or force as destroys the free agency and will power of the testator—that is, the person making the will—and makes him subject to the control of the person exercising such influence. It may consist of any improper or wrongful constraint, machination, or urgency of persuasion, whereby the will of that person is overpowered and he is induced to do or forbear doing an act which he would not have done, or forborne doing, had he been left to act free. Argument, persuasion, and appeals to the affection, which do not destroy the free agency, are not, of themselves, undue influence, nor advice and persuasion which do not supplant the will and purpose of another to that of the testator.

"Bearing in mind the foregoing instructions and definition, and those that may be hereinafter or by special charge given you, if you find and believe from a preponderance of the evidence that at the time Winfield Scott, deceased, executed the will, which has been read to you and introduced in evidence, he was under undue influence exercised by his wife, Mrs. Elizabeth Scott, one of the defendants in this case, and was subject to such undue influence, if any, in making such will, and at said time and in devising the property therein described, your verdict will be for the plaintiff, but if you do not so find and believe from a preponderance of the evidence, your verdict will be for the defendants."

By the fourth assignment of error, which is submitted as a proposition, it is insisted that the court "erred in the first paragraph of the court's charge defining undue influence because the same is not a correct and accurate statement of the law on that subject, and was misleading to the jury." By the fifth assignment, likewise submitted as a proposition, the contention is made that the court "erred in the first paragraph of the court's charge in defining undue influence, because the same gives a definition not applicable to the facts of this case, suggesting to the jury features of undue influence not raised by the evidence." These two assignments are too general to merit consideration, for neither the supposed inaccuracies nor the features of undue influence not raised by the evidence are pointed out. Furthermore, the definition of undue influence given in the charge is substantially correct, and practically to the same effect as special charge No. 7, requested by appellant, the refusal of which is made the basis of another assignment of error. Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98; Campbell v. Barrera, 32 S. W. 725; Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 442; 1 Underhill on Law of Wills, § 125; Schouler on Wills, § 227.

[7] Error is assigned to the second paragraph of the charge, quoted above, on the grounds that it instructed a verdict for the plaintiffs if the jury should find that testator executed the will while under and subject to the undue influence of his wife, without requiring the jury to find from the evidence that such undue influence caused him to make such will, and that but for such undue influence he would have made a different will. When that instruction is considered in connection with the explanation given in the first paragraph of the charge of what is necessary to constitute undue influence, as the jury were instructed to do, the criticism now under consideration is without merit.

[8, 9] By the eighth, ninth, and tenth assignments, all of which are submitted as

propositions, it is insisted that by paragraphs 1 and 2 of the charge an issue was submitted that was neither pleaded nor proven, but as the supposed features of difference between the issues referred to are not pointed out, the assignments are too general to merit consideration. Furthermore, we are of opinion that the charge was sufficiently definite to confine the jury to the one material issue of undue influence.

[10-12] Testimony was introduced relative to conversations between testator and Mrs. Elizabeth Scott, over appellant's objections thereto, as follows: John Weiderkrantz, a servant in testator's home, testified that in 1897, soon after the first marriage of Mrs. Townsend, he heard a conversation between testator and his wife, as follows: "Miss Georgia is married now, and you know how she married, and I know that you will cut her off forever. You promised me that, and I hope that you will never have anything more to do with her"—and that Mr. Scott then said: "Miss Georgia is my daughter. I love her, and it is hard for me to do." Objections urged to this testimony by appellants were that it was hearsay, irrelevant and immaterial. The witness further testified that in the year 1896, after contestant returned from school in New York, he heard a conversation between testator and Mrs. Elizabeth Scott, wherein Mrs. Scott, said: "I don't see why you keep Miss Georgia at home, why don't you send her out to some college?" to which Mr. Scott replied, "Why?" And Mrs. Scott said: "We cannot get along." And Mr. Scott said: "Well, I do not know why. Miss Georgia don't seem to be much bother to you"—to which Mrs. Scott replied: "No, but we cannot get along." Appellant's objection to this testimony was that it was hearsay, irrelevant, and immaterial to any issue in the case, and was too remote from the time of the making of the will.

Rose Hill, the colored nurse who accompanied testator and his family to Europe, testified that on board the steamship en route from Europe to the United States, about the 1st of September, 1909, "Mr. and Mrs. Scott were talking business—business matters on the boat, what was to be straightened up, and what was to be done when they got home, what was to be done when they got home concerning moving to St. Louis and getting matters straight. I cannot remember all the things, everything that was said between them, but there was some very important papers mentioned by Mrs. Scott. He (Mr. Scott) did not seem to be very anxious to sign some papers, I don't know what it was. Q. Did Mrs. Scott say anything to him—what did Mrs. Scott say, if anything? A. Well, Mrs. Scott had some business she wanted him to attend to; I don't remember what it was; I cannot say exactly just what it was, but I know she threatened him with taking the child away from him if he did not sign the thing she wanted him

to do." Objections urged to this testimony were that it was inadmissible, hearsay, immaterial to the issue, and because it was not shown that the said conversation had reference to any will, and because the witness stated that she did not know what it had reference to. The admission of this testimony is made the basis of appellant's twelfth assignment of error. Rose Hill further testified that Mrs. Scott "threatened several times—said she would take Winfield (that is the infant son of the testator and Mrs. Scott) and go away if Mr. Scott did not do the things she wanted done, and that he never wanted to do the things she asked him to do, and that she stated that quite often, and that Mr. Scott said that if Winfield was 14 years old he would take his child and go himself." The objections urged to this testimony were that it was immaterial to any issue in the case, irrelevant, and did not show or tend to show the exercise of any undue influence upon the testator in procuring the execution of the will in controversy. The admission of this testimony is complained of in appellants' twenty-second assignment of error.

Ed Cannon, a colored cook for testator's family, testified that at the lunch table one day in the year 1907 he heard Mrs. Scott say to testator that "she did not think Miss Georgia (the plaintiff) ought to have anything because she had not done according to what he (testator) wanted her to do, and that Mr. Scott replied thereto, 'She is entitled to as much as you are, she is my child.'" Appellants objected to this testimony upon the ground that it was irrelevant, immaterial, and hearsay and did not tend to prove the exercise of undue influence upon the execution of the will in contest.

Contestant Mrs. Townsend testified that during the third year of her stay in the convent at Dallas, and while her father and stepmother were on a visit to her in that school, and while the other children were going home for Christmas vacation, the following occurred: "I put my arms around my father's neck and begged him to take me home; that I was homesick and unhappy and miserable, and wanted to go home, and he says, 'I will take you home,' and Mrs. Scott says, 'No, she cannot come,' and took his arms from around my neck, and she says, 'You cannot come to my house. I do not have any children of my own, and I will not be bothered with other people's children.'" Objection urged to this testimony was that it was irrelevant, immaterial, too remote, and did not bear upon the execution of the will, made more than 20 years thereafter.

The witness Rose Hill further testified that in the year 1909, prior to the trip to Europe, she heard a conversation between testator and Mrs. Elizabeth Scott, about who should and should not go on said trip, as follows: "Mr. Scott suggested to Mrs. Scott

that Miss Georgia (plaintiff) wanted to go to Europe, and she said she would not have her trip disturbed by Mrs. Townsend going with them to Europe, and that she would not go if she went." Objection urged to this testimony was that it was irrelevant, immaterial, hearsay, and did not tend to prove the exercise of undue influence upon testator at the time he made the will.

The testimony of John Weiderkrantz, first quoted, bore directly upon the issue of undue influence, as it tended to show an effort on the part of contestee, Mrs. Scott, to have testator make a will excluding contestant from any share in his estate, and the failure of testator to deny the alleged promise to so deal with his daughter might reasonably be construed as an admission that he had made the promise, notwithstanding that his statement in that conversation indicated that possibly he had changed his mind and would not comply with the request. The rest of the testimony of the witness Weiderkrantz was admissible as tending to show that Mrs. Scott entertained hostile feelings, and hence admissible as a material link in the chain of circumstances relied on to support contestant's charge of undue influence.

The testimony of Rose Hill first referred to above, of which complaint is made in the twelth assignment, concerning the conversation which occurred on the steamship, considered in connection with the testimony of several witnesses, to be noted hereafter, of expressions of ill will on the part of Mrs. Scott toward contestant, and in connection with further proof of the fact that the execution of the will was the first business attended to by testator upon his return to Ft. Worth after the trip abroad, was admissible as tending to show that the execution of the will was the topic of conversation, notwithstanding the proof offered by contestee, which tended strongly to show that if any such conversation occurred, as testified to by Rose Hill, it had reference to the settlement of certain litigation then pending between testator and certain persons living in Stephenville, which threatened bodily harm to testator as the result of ill feelings on the part of his opponents, and which Mrs. Scott was very anxious to have settled, and which she had been endeavoring to persuade her husband to settle.

The purport of the testimony made the basis of the twenty-second assignment was that it was a common practice of contestee to make the same threat in order to induce testator to comply with her wishes relative to other matters, and proof of such custom, if not admissible to prove that the same threat was made to induce testator to execute a will, was admissible as tending to show that testator might expect the same consequences if he failed to comply with contestee's demand that he make such a will, and therefore as tending to show the state of

testator's mind at the time he executed the will, especially as the making of his will was of more serious import than the ordinary transactions of life. At all events, in view of all the other facts and circumstances introduced by contestant to establish the issue in controversy, the error, if any, in admitting the testimony to the declarations now under discussion would not be such error as to require a reversal of the judgment under rule 62a (149 S. W. x).

The testimony of the witness Ed Cannon, shown above, was also admissible, as it clearly tended to show an effort on the part of contestee to have testator exclude his daughter by will from a participation in his estate.

The foregoing testimony of Mrs. Townsend and the last-quoted testimony of Rose Hill tended to show that Mrs. Scott entertained unkind feelings towards contestant, which was a material circumstance, and was therefore admissible.

[13] The further objection to the testimony of Mrs. Townsend and that of the witness Weiderkrantz that the same was too remote is untenable for the reason that, instead of being disconnected with other material and more recent circumstances, it formed a part of a chain of circumstances relied on by contestant, tending to show a purpose on the part of contestee, of long standing and continuously pursued, to induce testator to exclude his daughter from a share in his estate.

[14, 15] Errors have been assigned to testimony to prove declarations of testator before and after the execution of the will, and in the absence of Mrs. Scott:

The witness Mrs. Jane L. Forrester, a professional nurse, who resided in Colorado Springs, testified that she had a conversation with the testator in Colorado Springs in 1906, in which testator told witness that he had in Colorado Springs a sick little girl; that he had been told that the climate would be beneficial to her health, and that he wanted to buy a comfortable little house for a Christmas present, and that the witness talked to testator and said that she was a lucky girl and asked him if his family all fared alike, to which testator answered: "The ones at home are always getting and have naturally the lion's share. I cannot make up to this little girl what she lost in the death of her mother, but eventually they shall all share alike." The same witness further testified that in June, 1907, while she was nursing contestant in Colorado Springs, Colorado, witness had another conversation with testator, during which he asked witness if it would be advisable to take Mrs. Townsend abroad, and witness said, "Not at the present time, and not in her present state of health," and the testator replied he did not mean now; he said he meant in the spring, probably in the springtime, and he

said, "I want you to reserve your time and take nothing on after May, because I contemplate a trip abroad, and I think it will do Georgia worlds of good, and I want you to leave your time open to take her," and, continuing, the witness testified that she treated the conversation in the nature of a joke until the following day, when testator said: "This is no joke. I mean it." The said witness further testified that while testator was visiting his daughter in Colorado Springs, in June, 1907, witness had another conversation with him, in which testator said that Mrs. Scott, the contestee, was ill, and could not accompany him to Colorado, and witness said, "I am very sorry Mrs. Scott is ill," and the testator replied: "I said that to Georgia. Mrs. Scott is not ill. If I mention Colorado or coming to see Georgia Mrs. Scott gets up some excuse to keep me home"—and that witness asked testator what Mrs. Townsend had done to Mrs. Scott to make her feel that way toward her, and testator said she was a mere child, and stated to witness that Mrs. Scott would raise h—l if he mentioned it, but he said: "It is not my will to ever put the ocean between Georgia and myself."

James W. Coffey testified that in December, 1909, he had a conversation with testator in Colorado Springs, Colo., in which testator told witness that he was endeavoring to buy a horse for his daughter, that he would not buy a horse or anything for his daughter unless he was sure it was absolutely gentle; that his daughter was the dearest thing in the world to him; that he had to know that the horse was gentle before he would buy it for her; that the witness let testator take a horse which he had for sale for trial, and, after testing the horse for two days, the testator expressed a great deal of feeling over his daughter's health. Witness further testified that in 1906 testator told witness he had bought his daughter a house known as the Chapman House in Colorado Springs, and said: "I cannot do too much for her; she has done everything in the world I have ever asked her to do for me. I will make her a present of a fine home for Christmas"—and that testator was very proud of his daughter, and very proud of her son, testator's grandson, whom he called Scottie. Witness further testified: That he had another conversation with testator in the spring of 1909, wherein testator said he was awfully disturbed. That he had had some trouble and was talking about making his will, and said that his wife had always wanted him to make his will, and that his wife did not like Georgia, but testator said, "That don't make any difference, she has made her will in my favor;" and witness said to testator: "What is going to become of that boy?" and testator said: "Oh, I'll take care of him; why there is a building in Ft. Worth that I have already told Georgia that I would put his name on it and

the year he was born. I am going to give that building to that boy. I promised Georgia that if she would make her will in my favor I would make my will leaving one-third of everything I had to her son and her." That he would give anything in the world if he could take his daughter's place and restore her to health, and that he was thankful he had money enough to give her the pleasures and comforts of life and try to restore her to health. That his wife did not like Georgia, and did not allow him to do things of that kind. Witness further testified that in the fall of 1909, in October or November, he saw testator in Denver, and testator again reiterated his statement, to the effect that he would give his life if he could restore his daughter to health; that his daughter was the dearest thing in the world to him; that it always seemed the ailing one was the dearest one, and could be the least spared; that she was the sweetest woman he had ever known, sweetest child, and was very dear to him, and said she would do anything in the world for him, and had. (The testimony of this witness concerning all the conversations shown is set out in bill of exception No. 13, and the objections hereinafter to be noted were made to it as a whole; but two assignments of error Nos. 29 and 30 are predicated thereon.)

Mrs. A. C. Squire testified that in October, 1909 (which was after the execution of the will), while she was in attendance upon Mrs. Townsend during her illness, as a professional nurse in contestant's home in the city of Denver, Colo., and while testator and contestee were visiting in contestant's said home, she heard a conversation between testator and Mrs. Townsend, in which testator said to Mrs. Townsend: "You see after I get all my debts paid I will lack a whole lot of being a poor man. You have everything to get well for because one-third of this is yours." (According to the witness' testimony, when testator made the statement quoted he referred to some figures he had made on some slips of paper, furnished him by witness at his request, to estimate the amount of his wealth and the amount of his indebtedness, and that in making the statement he referred to the figures so made.)

Mrs. A. C. Squire testified to another conversation between herself and testator which occurred the latter part of October or the first part of November in 1909, in Denver, which was subsequent to the execution of the will, while witness was still attending Mrs. Townsend as a professional nurse, and that in that conversation testator asked the witness regarding Mrs. Townsend's health, if the witness thought Mrs. Townsend was seriously sick, and if there was any chance of her getting well, testator stating at the time that he wanted witness to do all she could for Mrs. Townsend; that Mrs. Townsend had had a very unhappy life, and that he

had not been able—because Mrs. Scott had made it so unpleasant for him anything that he did for Mrs. Townsend, or anything he gave her; that he had not been so kind to her as he would like to have been, and if there was anything on earth that witness could do he wanted her to do it; that if Mrs. Townsend's finances were not so she could pay witness' salary, that he would pay her salary. Witness further testified that testator did thereafter send her $500 to Denver to pay her salary.

Witness John F. Baker, Jr., testified that about November 1, 1906, while he was agent for testator in Ft. Worth, Tex., and had charge of his correspondence, testator told him to be very careful and preserve his mail, and see that it was delivered to him; to be very careful, if any thing came from his daughter during his absence from the state, or when he would not be back for a few days, to open the mail, and if it was anything to answer it; to be very careful and not let his mail go to Mrs. Scott unless testator was there and sent for it; that there was a feeling between Mrs. Scott and his daughter which it was unnecessary for testator to go into. John F. Baker further testified that during the year of the panic testator sent his daughter a check for $300 and stated to witness at the time, "It is not necessary, Baker, to say anything to my wife about this matter." He further testified that testator stated at the time that the reason he did not desire his wife to know that he had sent a check for $300 to his daughter was that his wife objected to his doing anything for his daughter, and that his wife would raise the devil.

The witness Floyd E. Singleton testified that in April or May, 1910 (which was subsequent to the execution of the will), while he was a stenographer for testator, he wrote letters for testator to his daughter, and that testator told witness at the time not to mention to anybody that he had written them, and not to tell Mrs. Scott that he had written to his daughter; that Mrs. Scott and Mrs. Townsend did not like each other; that Mrs. Scott did not like Mrs. Townsend, and not to say anything about the letters to Mrs. Scott or anybody else.

Witness W. T. Pittman testified that he had a conversation with testator, in the spring of 1909, in which witness, after speaking of testator's wealth, asked him, "What are you going to do with all that money?" to which testator replied, "Oh, I guess I will have to give it to my children and let them enjoy it," and added that he was going to tear down the building on the corner of Thirteenth and Main streets and replace it with a building for his daughter, who lived in Denver, and give it to her, and that he was going to name it for his daughter Georgia.

The witness Rose Hill testified that in June, 1909, just prior to the time testator

159 S.W.—23 ·

and his wife left on their trip to Europe, testator told the witness that Mrs. Scott had been after him to make a will.

To all of the foregoing declarations by testator in the absence of contestee appellants objected on substantially the same grounds, to wit, that the same was hearsay, irrelevant, incompetent, and immaterial, and did not tend to prove that the will was executed under undue influence; and to the testimony of the witness Mrs. Jane L. Forrester, concerning the first conversation testified to by her, and the testimony of John F. Baker, concerning the conversations occurring in 1906, the added objection was urged that the same was too remote from the date of the execution of the will; and to the testimony of all those conversations occurring subsequent to the execution of the will was the additional objection that such purported declarations were not admissible because of the fact that they were made after the execution of the will, and were therefore incompetent to prove the exercise of undue influence upon the mind of testator at the time of making the will. But the testimony showing each conversation set out in each of the foregoing paragraphs was objected to as a whole. Appellants also requested a special instruction, excluding all of said testimony, which was refused.

But at appellants' request the court gave the following special instruction: "You cannot consider the testimony of any witness, showing or tending to show any declarations whatever made by the testator, Winfield Scott, in the absence of Mrs. Elizabeth Scott, either before or after the execution of the will which is in controversy in this case, for the purpose of determining whether the execution of said will was obtained by the contestee Mrs. Elizabeth Scott by the exercise of undue influence over the testator, Winfield Scott, and such declarations cannot be considered by you as proving the truth of the matters to which they relate, because as to such matter, and as to the exercise of undue influence upon the testator, such declarations are hearsay. Such declarations can only be considered by you for the purpose of determining the state of mind of the testator, and for the purpose of determining the effect upon his mind of such undue influence as was exercised upon him by the contestee Mrs. Elizabeth Scott in the event that such undue influence was exercised. In case you fail to find from the testimony the exercise of any undue influence by the contestee Mrs. Elizabeth Scott upon the testator, Winfield Scott, then and in that event you will discard entirely from your consideration the testimony of witnesses showing or tending to show declarations of Winfield Scott."

Some of that testimony was, by oral instruction from the court at the time of its admission, limited in the same manner as

was done by the written instruction quoted above.

It will be noted that in each instance the declarations of testator in the absence of contestee, detailed by the witnesses as shown above, consisted in whole or in part of statements and acts indicative of affection for his daughter, except in the single instance where Rose Hill testified that testator told her, just prior to his start for his European trip in 1909, that contestee desired him to make a will. At the time this testimony was introduced the court orally instructed the jury that the same could not be considered for any purpose except as tending to show, if it did tend to show, the condition of testator's mind at the time of the execution of the will.

Appellants urgently insist that none of those declarations were admissible, and have presented a great array of authorities, together with a very able brief, to support that contention. Perhaps the decisions tending most strongly to support that contention are Rankin v. Rankin, 151 S. W. 527, by our Supreme Court, and the decision of the Supreme Court of the United States in Throckmorton v. Holt, 180 U. S. 573, 21 Sup. Ct. 474, 45 L. Ed. 663. In Throckmorton v. Holt it was held that in a contest over the probate of a will the declarations of a testator, being hearsay, are never admissible, except upon the issue of testamentary capacity, or when made so near the act of the execution of the will as to constitute a part of the res gestæ of that act; and what is there said upon that question is quoted at length by our Supreme Court with apparent approval in Rankin v. Rankin, supra. In Throckmorton v. Holt, it is noted that the decisions of the state courts upon the question of the admissibility of such evidence are in conflict, and many decisions are cited holding the conflicting views. Among others mentioned in the footnote to that decision is the case of Johnson v. Brown, 51 Tex. 65. In Throckmorton v. Holt the only contested issues were whether or not the will proposed for probate was a forgery, and if not, whether it had been revoked by the testator before his death. The declarations held to be inadmissible in that case were those tending to show affection for certain of his relatives, who by the will were excluded from a share in his estate, and who by reason of kinship and such affection had reasonable grounds to expect to be remembered in the will; also declarations by the testator of his intentions to provide in his will for some of those relatives who were omitted. The case of Rankin v. Rankin was a suit to cancel a deed executed by Mrs. Charlotte Rankin to her daughter-in-law, Mrs. L. A. Rankin, to 200 acres of land, on the ground that the execution of the deed had been procured by fraudulent misrepresentations made to her by her son, the husband of Mrs. L. A. Rankin; the suit being instituted after the death of Mrs. Charlotte Rankin. We gather from the opinion that the only proof offered to support the allegation of fraud was testimony that after the execution of the deed Mrs. Rankin stated that she was induced to execute the same by the representations, made to her by her son, that a former deed, which had been executed by her to another tract of land of 100 acres, had incorrectly described the tract then intended to be conveyed, and that the deed in question was a substitute for the former deed, and conveyed the same land intended to be conveyed by the former deed. Our Supreme Court through Chief Justice Brown held that such testimony was not admissible; that those declarations were not competent to sustain the plea of fraud.

Some of the other decisions cited by appellants are as follows:

Helsley v. Moss, 52 Tex. Civ. App. 57, 113 S. W. 599, by the Court of Civil Appeals, and in which a writ of error was denied by our Supreme Court, in which it was held that certain declarations of a testator were properly excluded. One of these declarations was, in effect, that testator intended at her death that all her property should be equally divided among her children, and that her husband, who was present, angrily objected, with the remark that the testator's children by a former marriage would not get any more if he could help it. This conversation occurred nine years before the will was executed, and the court held that the same was too remote to show undue influence. Other declarations by the testator indicating a like intention were held inadmissible, on the ground that there was no evidence of mental incapacity, nor of the exercise of undue influence, and others on the ground that they were too remote, and others still on the ground that they tended to prove no issue in the case.

Kennedy v. Upshaw, 64 Tex. 411, in which it was held that the declarations of a testator, made after the execution of a codicil to his will, were hearsay, and not admissible to prove that the codicil was a forgery.

McIntosh v. Moore, 22 Tex. Civ. App. 22, 53 S. W. 611, wherein the controverted issue was whether or not a will executed by a testator, but which was lost, had been revoked, and in which it was held that proof of his declarations of certain facts which, if true, tended to show a revocation of the will, were not admissible as evidence of such revocation but were admissible for the purpose of showing the condition of testator's mind at the time when a supposed will was destroyed.

Campbell v. Barrera, 32 S. W. 724, was an action to set aside a will on the ground that its execution was procured by the exercise of fraud and undue influence, practiced upon testatrix by two of the devisees in the will and in which it was held that testimony to

statements made by testatrix after the execution of the will, and expressive of her dissatisfaction with it, was inadmissible as primary proof of fraud or undue influence, but that such declarations "were competent to establish the influence and effect of the external acts (if any are shown) upon the mind of testatrix herself." Another case of like purport is Wetz v. Schneider, 96 S. W. 59.

Simon v. Middleton, 51 Tex. Civ. App. 531, 112 S. W. 441, in which it was held that a letter written by testator after the execution of his will, stating certain facts and assigning them as a reason for cutting off an allowance he had been making to his daughter, did not tend to prove the exercise of undue influence upon the testator in making his will two years prior to the date of the letter. But in that case it was further held that it was permissible to prove declarations by testator, made to his daughter after the execution of the will, consisting of a charge of improper conduct against her, coupled with a statement that the basis of the charge was what testator had been told by one of the favorite devisees under the will. Some of the other authorities cited by appellants in support of the contention are: Gwin v. Gwin, 5 Idaho, 271, 48 Pac. 295; 1 Underhill on Law of Wills, §§ 161–163; Townsend v. Townsend, 128 Iowa, 621, 105 N. W. 110; Ormsby v. Webb, 134 U. S. 47, 10 Sup. Ct. 478, 33 L. Ed. 805.

It will be noted that in some of the decisions discussed above the declarations of the testator were excluded, not because they were hearsay, but because they did not tend to prove the allegations sought to be established. This distinction is helpful to a proper understanding of many decisions upon the question now under consideration.

In Throckmorton v. Holt and Rankin v. Rankin, supra, the declarations were excluded, not because they did not tend to prove the issue, but because they were hearsay. It will be noted, also, that in the latter case the declarations excluded were merely recitative of past occurrences, as distinguished from spontaneous expressions of feelings entertained by the testator. Hence clearly they came within the hearsay rule. The distinction between declarations that are mere narratives of facts and those that are expressive of some mental state, it is believed, will likewise furnish a satisfactory explanation of apparent conflicts in some of the many decisions throughout the country upon the question now under discussion.

That physical suffering, intentions, ill feelings, affections, and other emotions, when they are material circumstances to establish an issue, may, on the principle of res gestæ, be established by proof of declarations contemporaneous with such intentions or feelings indicating them is a familiar doctrine; and this exception to the general rule, which excludes hearsay testimony, is as well established as is the rule itself. Wheeler v. T. S.

& E. Ry. Co., 91 Tex. 356, 43 S. W. 876; Railway v. Gill, 55 S. W. 386; Life Insurance Co. v. Hillmon, 145 U. S. 296, 12 Sup. Ct. 909, 36 L. Ed. 706; Travelers' Ins Co. v. Moseley, 8 Wall. 397, 19 L. Ed. 437; 1 Greenleaf on Evidence, 102.

The following decisions of our own court: Johnson v. Brown, 51 Tex. 80; Robinson v. Stuart, 73 Tex. 267, 11 S. W. 275; McElroy v. Phink, 97 Tex. 147, 76 S. W. 753, 77 S. W. 1025; Stubbs v. Marshall, 54 Tex. Civ. App. 526, 117 S. W. 1030; Goodloe v. Goodloe, 47 Tex. Civ. App. 493, 105 S. W. 533, loc. cit. 538—support the proposition that the state of the testator's feelings toward members of his family, among whom he had made an unequal and unnatural distribution of his estate, together with his intention, entertained both prior and subsequent to the execution of the will, relative to a distribution of his estate, are circumstances that can be proven as tending to show the effect of efforts exerted to unduly influence the testator, after such efforts have been established by other evidence, and that proof of the declarations of the testator expressive of such feelings or intentions is admissible. See, also, the following authority, to the same effect: 3 Wigmore on Evidence, page 2241.

None of the Texas cases last above cited are referred to in Rankin v. Rankin, and we cannot believe that in the latter decision it was intended that they should be overruled, especially in view of the fact that the latter decision is not necessarily in conflict with them; and we feel that those decisions are controlling in this case to the exclusion of the decision in Throckmorton v. Holt and other authorities to the same purport cited by appellants, and too numerous to be discussed.

[16] We conclude that the testimony of conversations between testator and contestee, first above set out, tended to show efforts of contestee to unduly influence testator to make a will excluding his daughter from a share in his estate, and that it furnished a sufficient predicate for the admission of the testimony of declarations by the testator in the absence of contestee, referred to above; and, in view of the court's instructions limiting the purposes for which such declarations could be considered by the jury, we think there was no error in admitting them. In many instances portions of the declarations of the testator in the absence of his wife consisted of statements such as that contestee did not like his daughter, and other statements recitative of certain facts which did not tend to show his feelings of affection for his daughter, nor his intention to remember her in his will more favorably than was done and were therefore, perhaps, not admissible under decisions of this state noted, but other portions of the declarations indicated such feelings and intention, and were therefore admissible under those decisions; and, as in each instance the objection to the declara-

tions were urged to them as a whole only, and a part being admissible, there was no reversible error in overruling the objection. Stubbs v. Marshall, 54 Tex. Civ. App. 526, 117 S. W. 1030, and authorities there cited. This conclusion, however, is not applicable to the declaration of testator detailed by witness Rose Hill, in effect, that contestee desired him to make a will. But in view of the fact that the witness James Coffey also testified to a statement by testator on another occasion to the same effect, and the admission of which testimony under the circumstances, as shown above, was not erroneous and of the further testimony of witnesses hereinafter noted, in effect, that Mrs. Elizabeth Scott had stated on different occasions that testator had promised her to exclude his daughter from a share in his estate, to which no proper objection was made, and of the limitation placed upon the evidence now under discussion, by the trial court, the error, if any, in admitting it is not such as to require a reversal of the judgment.

[17] The fact that the will was never revoked, although more than two years transpired from the date of its execution until the date of testator's death, was a circumstance tending to refute the contention of contestant that its execution was the result of undue influence exercised upon the testator. To refute this circumstance the alleged declarations of testator, made after the will was executed, tending to show the same affection and testamentary intentions towards his daughter as he entertained before the execution of the will, were admissible on the same principles as above stated, for the purpose of showing that the efforts theretofore made by contestee, if any, to unduly influence testator were still operating upon his mind, and that but for same the will would have been revoked.

No witness testified to any lack of affection on the part of the testator for his daughter, and in appellants' briefs no contention is made that there was an absence of such affection. This of itself is a sufficient answer to the objection to some of the declarations of testator as being too remote.

[18] Errors have been assigned to the admission, over objections of appellants, of testimony to show the following declarations by Mrs. Elizabeth Scott in the absence of testator:

Witness Rose Hill testified that during the year 1909, while witness was a nurse for Winfield Scott, Jr., and living in testator's home, Mrs. Elizabeth Scott told witness she did not have any use for Mr. Scott's daughter, and that she did not want to be bothered with her; that she did not like Mr. Scott's daughter, and that she was just coming around to see what she could get out of him; that was all she came for.

John Weiderkrantz, coachman and yardman for testator, testified that in August, 1897, shortly after the marriage of Mrs. Townsend to John T. Carter, Mrs. Elizabeth Scott stated to witness: "I am certainly glad that Georgia has married, and that it has happened, because Mr. Scott promised me to cut her off entirely."

John F. Baker, Jr., one of the witnesses above named, testified that in February, 1907, Mrs. Scott came into testator's office, then in charge of the witness, while there was a letter lying on the desk from Mrs. Townsend to her father. Referring to the letter, Mrs. Scott inquired of witness what Mrs. Townsend wanted at that time, to which witness replied the letter had not been opened, that testator was absent at his ranch, but would return on the 1 o'clock train. Mrs. Scott then replied that testator had invited Mr. and Mrs. Townsend to come to the Fat Stock Show at that time, but that she did not want them to come; that she and Georgia were not very friendly, and she did not like her; in fact she did not like any of Mr. Scott's people; that they were not her kind; that testator had done too much already for Mrs. Townsend, and that she did not want him to do any more; that what Mr. Scott had at that time belonged to her and Winfield, and that testator had already given Mrs. Townsend all that she was entitled to at the time of her mother's death, and that she did not want testator to give Mrs. Townsend any more; that testator had already promised her that he had made all the provisions he was going to make for his daughter.

Witness Rose Hill, mentioned already, testified that on the night of September 23, 1909, while witness was serving as a nurse for Winfield Scott, Jr., in St. Louis, testator left St. Louis, Mo., where he was then living, for Texas; that after he came to Texas, Mr. John R. Townsend, the husband of the plaintiff, came to St. Louis about November, 1909, and made a visit to Mr. Scott's house; that after that visit Mrs. Elizabeth Scott spoke to witness about it, saying that Mr. and Mrs. Townsend "need not be watching around to see what they could get out of Mr. Scott because she would see that they did not get any more than they had."

Alex Johnson testified: That he was in the service of testator in the capacity of coachman and yardman, and that Winfield Scott, Jr., was born while witness was so engaged. That shortly after the birth of the baby, which was in the month of November, 1901, Mrs. Georgia Scott Carter visited the house of testator; that after said visit, and after Mrs. Carter had left testator's home to take the train, Mrs. Elizabeth Scott said to witness: "What did Georgia say about the baby? I bet Georgia feels like killing that baby because she knows she isn't going to get this out of Mr. Scott's estate now." Said witness Alex Johnson further testified that on one occasion, while he was driving Mrs. Elizabeth Scott with her infant son, Winfield

Scott, Jr., then about six months old, down Main street in Ft. Worth, witness had a' conversation with Mrs. Scott while she and witness were' looking at testator's buildings, in which Mrs. Scott said to witness: "This little boy (Winfield) is going to be a millionaire boy because he is going to get all these blocks there on Main street." "She said, 'Miss Georgia has always displeased her father,' and she did not think she could get very much out of the property."

The declarations so detailed by the witnesses were in each instance objected to by appellants substantially upon the same grounds, viz., they were immaterial, irrelevant to any issue in this cause, hearsay, too remote from the time of the execution of the will, incompetent. To declarations detailed by the witness John Baker the additional objection was urged that there had been no predicate laid for their introduction, for the purpose of impeaching witness Mrs. Elizabeth Scott, who had already been on the witness stand, further than that Mrs. Scott had been asked by appellees' counsel if she did not tell witness Baker that she did not like any of Mr. Scott's people, and that they were not her kind. To which question Mrs. Scott had given a negative answer. To the testimony of Rose Hill relative to declarations made by Mrs. Scott in her home in St. Louis in November, 1909, concerning Mr. and Mrs. Townsend, set out above, the additional objection was made that such declarations occurred after the execution of the will. And to the last declarations, set out above, a further objection was urged that no evidence had been introduced to show the exercise of undue influence upon testator at the time of the execution of the will.

The objections urged to the supposed declarations of contestee, set out in each paragraph of the last preceding statements, were urged to them as a whole. Some of those declarations were perhaps within the hearsay rule, but the declarations so objected to in each instance consisted, either in whole or in part, of expressions of ill feelings towards contestant, or of an intention to induce testator to exclude contestant from a share in testator's estate, and if such portions of the declarations were admissible, there was no error in overruling the objections in toto.

[19] Many authorities are cited in appellants' brief to the effect that declarations of a devisee or legatee are not admissible to prove that the execution of the will was procured by undue influence; such as Helsley v. Moss, 52 Tex. Civ. App. 57, 113 S. W. 601; Ormsby v. Webb, 134 U. S. 47, 10 Sup. Ct. 478, 33 L. Ed. 805; Eastis v. Montgomery, 93 Ala. 293, 9 South. 311; Appeal of Dale, 57 Conn. 127, 17 Atl. 757; Campbell v. Campbell, 138 Ill. 612, 28 N. E. 1080. The theory upon which these decisions proceed is that where there are other beneficiaries under the will besides the one whose declarations are sought to be proved, their interest could not be affected by the declarations, even though they are parties to the suit. In other words, the declarations are treated as admissions against the interest of the declarant, and the question of whether or not they are admissible is determined from that standpoint.

We think these decisions announce the correct rule from the standpoint noted. If the declarations of contestee now under discussion are to be viewed from that standpoint alone, then the objections should have been sustained because her son Winfield Scott, Jr., was the principal beneficiary under the will, and any admissions made by his mother, viewed as admissions only, could not affect his interest. But in view of the fact that contestee upon the witness stand denied all of the conversations between herself and husband, testified to and set out above, we are of the opinion that, in order to corrobor-. ate the testimony offered to show those conversations, it was permissible for appellees to show that contestee entertained feelings of ill will towards contestant, and an intention to induce testator to exclude her from a further participation in his estate, and . that evidence of the declarations of contestee now under discussion, although in the absence of testator, were properly admitted for that reason. See authorities· cited in 11 Encyc. of Evidence, 174–176.

[20] The declarations detailed by Rose Hill, occurring in St. Louis after the execution of the will, were admissible for the same reasons that are given above to sustain the admission of declarations of the testator, also made after the execution of the will.

[21] The objection to some of the declarations as being too remote from the date of the execution of the will were untenable, in view of other evidence tending to show a continuation of the same ill feelings and intentions on the part of contestee up to and after the date of the execution of the will.

[22] By the eleventh assignment of error the contention is made, in effect, that the evidence introduced by contestant, taken as a whole, was insufficient, prima facie, to support the allegation that the execution of the will was procured by undue influence, and that for that reason the court erred in refusing appellants' request for a peremptory instruction to the jury to return a verdict in favor of defendants. In this connection appellants call attention to the testimony introduced by them to rebut any apparent weight which the testimony introduced by the appellees might have in the absence of any controverting evidence. In addition to the facts and circumstances already noted, A. B. Robertson, the executor named in the will, who had been an intimate friend of testator approximately 30 years, during a part of which time he was associated with testator in business, testified to a conversation with tes-

tator during his last illness, and about three days before his death, in which testator expressed serious apprehensions relative to his chances for recovery, and told witness that he had made his will, and requested a promise from witness that if anything happened to testator, to see to it that his will was carried out, and further requested witness to see testator's wife and daughter and induce them to abide by the will. That testator wanted witness to see that his boy was treated right and got what property had been left to him in the will, mentioning the ranch especially, and stating that the property left to the boy had been left to him in such manner that he could not place any liens or mortgages on it until he became of a certain age.

C. H. Bencini, who for many years was an intimate friend and business associate of testator, testified that about three weeks before testator died testator told him that he had made a will just exactly as he wanted it, and that he desired his friends to see that his will was carried out; that he had willed the bulk of his property to his boy, and requested witness to look after the boy, stating further that he had settled with his daughter.

N. A. Perry, another business associate and acquaintance for years, testified that some two or three months before testator's death testator told him that he desired the bulk of his property to go to his son, and had arranged it so that it could not be disposed of during his son's lifetime; that he had already provided for his daughter.

R. H. Brown, another friend and business associate of testator, testified that on a number of occasions testator told witness that he had willed his ranch to his son, and had so arranged it that no one could take it away from him, without mentioning what disposition he would make of the balance of his estate.

J. B. Sykes, another acquaintance of testator, testified that during the latter part of May, 1909, testator told witness that he was going to give his son his ranch and Metropolitan Hotel property and the Worth and Terminal Hotel property, and was going to fix the ranch so that it could not be leased or handled in any other way; that he wanted his son to operate the ranch.

E. C. Freeman, another business associate of testator, testified that on many occasions he heard testator say that he had bought the ranch and was fixing it up for his son, Winfield.

Mrs. Josie H. Barnes, daughter of Major E. B. Harrold, who for many years was a partner and close personal friend of testator, testified that in October, 1911, testator told her that he had provided for his wife and daughter, and that nearly all of the balance of his estate would go to his son, whom he expected to make the richest boy in Texas. Practically all of the witnesses last named further testified that testator on many occasions expressed his affection, for his son, of whom he seemed to be very proud, and that they never at any time heard testator say anything indicating that his wife had exercised any influence over him relative to a disposition of his property by will.

Judge Miller, who prepared the will in controversy, further testified that he prepared two previous wills for testator, one in 1902 and another in 1905, in each of which, according to witness' recollection, only one piece of property was willed to testator's daughter, not the same property devised to her in the last will. Witness further testified that in the first will the bulk of testator's estate was devised to A. B. Robertson, trustee for Winfield Scott, Jr., with power in the trustee to keep and manage it until the son should reach the age of 30 or 35 years; and, further, that at the time testator requested witness to prepare the will in controversy he told witness that he desired to leave to his daughter more property than he had in his former will, rent-bearing property. Witness further testified that at one time, at testator's instance, he prepared a will to be executed by Mrs. Georgia Scott Townsend, which was thereafter executed by her; also a will for testator's wife, which was never executed.

The evidence referred to above is not all of the evidence introduced by appellants to controvert the testimony offered by appellee to show undue influence, but the same constitutes the evidence chiefly relied on by them.

Contestee denied all the alleged declarations by her in the absence of her husband, testified to by different witnesses and shown above. According to testimony given by her, relations between herself and contestant were pleasant, and she entertained feelings of parental regard for contestant at all times.

In rebuttal, however, Mrs. Georgia Scott Townsend testified that during the latter part of the year 1897, after her first marriage, she had a conversation with her father in his office at Ft. Worth, during which conversation her father showed her a will, stating to her at the time that by the terms of that instrument he had willed to his daughter one-half of his property, besides what he had given to his sister and his colored man named John. Witness further testified that her father held out the will to her during this conversation, but that witness did not read it.

Notwithstanding the testimony offered by appellants, we are of the opinion that the testimony introduced by contestant amounted to more than a mere scintilla of proof, and that it was of sufficient probative force to warrant the submission of the issue of undue influence to be determined by the jury. Hence the assignment now under discussion is overruled. Bradshaw v. Seaton, 128 S. W. 943 (in which writ of error was

refused); Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; Warren v. Ellis, 137 S. W. 1186; 1 Underhill, Law of Wills, § 132.

The judgment is affirmed.

### On Motion for Rehearing.

[23] The conclusion expressed upon original hearing that the objection urged to the testimony of Rose Hill, in effect, that in June, 1909, prior to his trip to Europe testator told witness that Mrs. Scott had been after him to make a will, was waived by a failure to urge a proper objection to the testimony to the same effect, given by James Coffey, is, perhaps, without precedent in the decisions. The principle upon which we reached that conclusion was that the improper objection to Coffey's testimony amounted to no objection at all, and hence that the general rule holding appellants to a waiver of a right to complain on appeal of the admission of Rose Hill's testimony should apply. However, that conclusion was unnecessary to sustain the ruling of the trial judge in our opinion. As noted in the original opinion, the jury were instructed that the foregoing testimony of Rose Hill could not be considered as any evidence of the truth of those declarations, but that the same was admitted for the purpose of showing, if it did tend to show, the state of testator's mind at the time the will was executed. And all of the testimony of the witness James Coffey, as well as that of other witnesses relative to declarations made to them by Winfield Scott, in the absence of his wife, was likewise limited in the same manner by the special instruction quoted in the original opinion. Upon more mature consideration we are of the opinion that this evidence of Rose Hill, and other testimony of like character, was admissible as a circumstance for the purpose stated by the trial judge, and that it did not come within the hearsay rule. Stubbs v. Marshall, 54 Tex. Civ. App. 526, 117 S. W. 1030, and authorities there cited.

[24] If this conclusion be incorrect, then the error in admitting it would not require a reversal of the judgment under rule 62a, since there is nothing in the record to indicate that the jury did not obey the court's instruction that the declaration could not be considered as evidence of its truth, for we must presume, as said by Chief Justice Brown in M., K. & T. Ry. Co. v. Beasley, 155 S. W. 183, "that the jury consisted of men of ordinary intelligence and honesty, having a desire to apply the charge to the facts."

[25] We did not in terms discuss appellants' forty-first, forty-second, forty-third, and forty-fourth assignments of error in our original opinion, but did consider them, and conclude that they should be overruled. By those assignments complaint is made that the trial court erred in overruling appellants' motion for a new trial, first, because there

was no legal and competent testimony tending to show that Mrs. Scott had exercised any undue influence on her husband in the execution of his will; second, because the evidence conclusively established that the execution of the will was not the result of any undue influence upon the testator, but was his own free will; third, because the jury ignored the court's instruction to disregard the declarations of Winfield Scott as evidence of the truth of the declarations, aside from which there was no evidence to show undue influence upon the testator. In this connection we wish to add that in our opinion the evidence relied on in this case to show the will in question was the result of undue influence exercised upon the testator is at least as potent, if not more so, to prove that issue than the evidence introduced in the case of Bradshaw v. Seaton, 128 S. W. 943, cited in the original opinion, to prove the same issue. The most cogent facts and circumstances in evidence to support the verdict in that case are set out in the opinion. While the evidence so recited tended directly and positively to support the conclusion that Mrs. Rosa Seaton, wife of testator, J. B. Seaton, could have unduly influenced her husband to execute the will in controversy in that case, yet no witness testified that she ever made any suggestion to her husband relative to the making of any will at all, except I. N. Jackson, the attorney who prepared the will for J. B. Seaton, and who testified (as shown in the record of that case now before us) that on the occasion when he did so, J. B. Seaton and his wife came to his office together; that J. B. Seaton gave to the attorney instructions how he desired to dispose of his property, one of which directions was that he desired to leave to his adopted son, Wesley Seaton, $5, saying that his adopted son had not treated him right; that he had run off and left him, but finally increased such bequest to $25. This witness further testified that Mrs. Seaton did not discuss the terms of the will with testator at the time, except to suggest to her husband that the amount left to Wesley Seaton be increased, further testifying, "I don't remember what amount Mrs. Seaton wanted to be given to Wesley Seaton."

In the case at bar there was direct and positive evidence tending to show an effort on the part of contestee to unduly influence her husband in the execution of his will, and the evidence relied on by contestant to show that the efforts so exerted had the desired effect consisted of circumstances only, but those circumstances were at least as strong, if not stronger, than were the circumstances relied on in Bradshaw v. Seaton to show that Mrs. Seaton attempted to exert the influence over her husband, which other evidence showed that she had the ability to exert.

The motion for rehearing is overruled.