### WARREN v. ELLIS et al.

(Court of Civil Appeals of Texas. Galveston. April 20, 1911. Rehearing Denied May 25, 1911.)

1. WILLS (§ 302*) — PROBATE — EXECUTION — EVIDENCE.

In a proceeding for the probate of a will, evidence *held* to show that the testator observed the formalities prescribed by Rev. St. 1895,

arts. 1904, 5335, which require a will to be in writing signed by the testator, and, if not wholly written by himself, to be attested by two witnesses.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 700–710; Dec. Dig. § 302.*]

2. WILLS (§ 31*)—TESTAMENTARY CAPACITY —DEGREE OF MENTAL CAPACITY.

A person possessing mental capacity sufficient to enable him to know and understand the transaction may make a will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 66–68; Dec. Dig. § 31.*]

3. WILLS (§ 155*)—VALIDITY—UNDUE INFLUENCE.

Whether or not a will is void for undue influence depends upon whether it was the free and voluntary act of the testator or was the act of another who unduly influenced him.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

4. WILLS (§ 324*)—PROBATE—JURY QUESTION.

In a will contest, deceased's mental capacity and the exercise of undue influence over him are for the jury.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 767–770; Dec. Dig. § 324.*]

5. TRIAL (§ 139*)—TAKING CASE FROM JURY —DIRECTED VERDICT.

Questions of fact should be submitted to the jury, unless the evidence be of such a character that reasonable minds could not differ about it.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332–341; Dec. Dig. § 139.*]

6. WILLS (§ 386*)—REVIEW—DIRECTED VERDICT.

In reviewing a directed verdict against the proponent of a will, the appellate court does not determine whether a verdict for the proponent should have been allowed to stand, but whether the evidence was sufficient to go to the jury.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 859; Dec. Dig. § 386.*]

7. WILLS (§ 324*)—PROBATE—TRIAL — QUESTIONS FOR JURY.

That testator was old and infirm, and executed his will at a small village some distance from his home, to which place he had driven with his newly married wife, and that the will was in type, and there was no reason shown why testator excluded his children, and the wife did not offer to testify, did not authorize the court to take the issue of the validity of the will from the jury.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 767–770; Dec. Dig. § 324.*]

8. WILLS (§ 302*) — PROBATE — EVIDENCE — KNOWLEDGE OF TESTATOR.

In a proceeding for the probate of a will, evidence *held* to show that the testator had knowledge of its contents.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 700–710; Dec. Dig. § 302.*]

9. WILLS (§ 302*)—PROBATE—EVIDENCE—SIGNATURE OF WITNESSES.

In a will contest, evidence *held* sufficient to support an inference that the witnesses to the will signed at the testator's request.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 302.*]

10. WILLS (§ 324*) — PROBATE — EVIDENCE — TESTAMENTARY CAPACITY.

In a proceeding for the probate of a will, evidence as to testamentary capacity *held* for the jury.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 767–770; Dec. Dig. § 324.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

Appeal from District Court, Harris County; Norman G. Kittrell, Judge.

Application by Mrs. Ella Warren for the probate of a will which was contested by Eliza Ellis and others. From a judgment of the probate court refusing probate to the will, proponent appealed to the district court, and from a judgment in that court refusing probate, she appeals. Reversed and remanded.

Lewis & Austin and Andrews, Ball & Streetman, for appellant. Hutcheson, Campbell & Hutcheson, for appellees.

REESE, J. Mrs. Ella Warren, widow of John Warren, deceased, filed her application in the probate court of Harris county to have probated a certain paper alleged to be the last will and testament of the said John Warren, and praying that letters testamentary issue to her as executor named as such in said paper. Mrs. Eliza J. Ellis, joined by her husband, George Ellis, and Mary J. Peil, joined by her husband, W. J. Peil, who, with John Warren, Jr., are the sole surviving children, and, with the exception of said widow, sole heirs at law of said John Warren, interposed a contest of said probate, alleging: (1) That the instrument was not the will of deceased, but is an instrument fraudulently procured by the proponent at a time when the deceased was mentally incapable of making a will. (2) That at the time the pretended will was made deceased was, and had been for several years, wholly incapable of making a will and was not of sound mind and disposing memory. (3) That the said will was not executed in conformity with the requirements of law. (4) That at the time of making of the will deceased was in a physical and mental condition incapable of voluntary action of any sort, and wholly under the influence of and control of proponent, and was not a free agent, and the making of said will was brought about by the coercion, influence, and command of proponent. These general allegations were further amplified by a detailed statement of the circumstances under which the said paper was signed, which need not be here set out. Proponent denied generally the allegations of this pleading. The application coming on to be heard in the probate court, proponent made application for continuance on account of the absence of several witnesses, among them, one of the two witnesses to the will, which was overruled, and thereupon the court, upon the evidence, refused to probate the will, from which judgment proponent appealed to the district court. In the district court contestants filed an amended answer to the application to probate, setting up, substantially, the same objections above referred to with much amplification of detail as to the circumstances existing prior to and at the time of the execution of the proposed will, and showing mental unsoundness on the part of deceased, undue influence on the part of proponent, and that the paper offered for probate was not executed according to the requirements of law, and was not the free and voluntary act of deceased, but was signed by him under coercion of proponent and in ignorance of its contents. Proponent to this made general denial. The case went to trial with a jury. Proponent introduced the said alleged will and the testimony of E. F. Johnson and Frank Peterson, the two witnesses to the execution of the will, and also one N. S. Schmitz, who testified as to the mental condition of deceased, and rested. Thereupon the contestants moved the court, by written motion, to instruct a verdict for contestants, for the following reasons:

"1. The evidence of the proponent in this case fails to comply with the law imposing upon her the burden to prove the following facts, before this will can be probated, to wit:

"(a) To show that the will was made in conformity to the law, in that it does not disclose any fact or facts from which a knowledge of its contents is shown to have been imparted to the deceased, in any way, or at any time, or by anybody.

"(b) It does not show that the deceased desired or requested the attestation of said will, but the contrary shows that the sole beneficiary thereunder procured the execution of the same and the attestation thereof.

"(c) There is not the slightest testimony in this case to sustain the burden of proof imposed upon the proponent by the statutes and decisions of this state that the deceased was of sound mind and disposing memory at the time the said will was executed.

"(d) There is affirmative and strong presumption arising in this case that the will is not that of the deceased, growing out of the following facts:

"(1) The will being in type, there is no explanation offered showing who prepared the same, or that it was prepared at the instance of the deceased.

"(2) There is no evidence to account for, or explaining, the unusual circumstances under which the will was made, including the trip to Cypress.

"(3) There is no evidence offered by the proponent to show why she is made the beneficiary of said will to the exclusion of his children.

"(4) There is a presumption arising against the will growing out of the failure of the proponent to introduce testimony entirely within her knowledge concerning all of these facts, or to offer to testify herself concerning the same though she is present in court, and has been during the entire presentation of the case, which conduct on her part raises the presumption of law against the integrity of the will."

This motion was sustained. Upon peremptory instruction the jury returned a verdict

for contestants, and judgment was rendered in accordance therewith, from which the proponents prosecute this appeal. The only error assigned is as to the action of the court in peremptorily instructing a verdict, and the proposition is advanced that the issues should have been submitted to the jury. So the only question presented by this appeal is, Did the evidence present an issue or issues of fact, as to the essential facts which were required to be established in order to authorize the probate of the will?

The evidence established the following facts: John Warren, Sr., was an old man—quite an old man—though the evidence does not establish his age. A short time before the execution of the paper—about two months —he had married a Mrs. Goodrich, herself not a young woman, but some 50 years of age. They lived at the town or village of Hockley. John Warren, by a previous marriage had three children; the contestants, married women, and a son, John Warren, Jr., good, dutiful, and affectionate children. He had an estate, as stated in the application to probate the will, of $50,000 in value. For some time before the date of the signing of the instrument offered for probate he had been sick and was at that date quite feeble, so much so, perhaps, that he could not get about well without assistance. On the morning the paper was executed he and his wife came in a buggy from their home at Hockley, where it seems John Warren had lived a great many years, to Cypress, a small village, smaller in population than Hockley, and 10 miles distant therefrom. Arriving at Cypress between 10 and 11 o'clock, they drove up to the store of E. F. Juergen, in which there was a sitting room. Mrs. Warren alighted from the buggy and assisted John Warren to alight, and with her assistance he was helped into the room and seated in a rocking chair. Mrs. Warren then asked Juergen to get Frank Peterson, who also lived at Cypress, as did Juergen, and who had formerly been in the employ of Mrs. Warren, and told Juergen that she wanted Peterson to witness a will. Juergen found Peterson in a convenient saloon and told·him what Mrs. Warren wanted, and went back to the store, when Mrs. Warren took the will from her bag and handed it to Juergen, who was reading it, not aloud, when Peterson came in. Peterson testified: "When I came in there, Mr. Juergen was sitting at a table, and he had this will there reading it, I suppose, and he says to me, 'Here is a will that Mr. Warren made to Mrs. Goodrich (Mrs. Warren), and he would like for you and I to be witnesses,' and I said, 'All right; if that is all it is, I will sign as a witness.' That was in the presence of Mr. Warren. He was right there, and Mrs. Warren was right there. I saw Mr. Warren sign the will, he signed it in my presence and in the presence of Mr. Juergen.

At the time he signed the will, Mr. Juergen got up from the table, and says to Mr. Warren: 'Do you know what this is?' and Mr. Warren says, 'Yes, yes, I know what it is; I'll sign it,' and reached over for the paper and laid it down and signed it. Mr. Juergen signed it first, and then I signed it." . On cross-examination Peterson said that when Juergen came to him at the saloon he did not tell him what it was about, but only that Mrs. Warren wanted to see him, and he further testified that when he got to the room, Juergen told him that Mrs. Goodrich had a will there which she wanted him to witness. Mr. Warren heard him say this and made no reply. He understood that the request came from Mrs. Warren. After the will was signed, Mrs. Warren took it and put it in her bag.

Juergen's testimony differed but slightly from that of Peterson as to the signing of the will. We quote his testimony in chief, which he repeated in all substantial particulars on cross and re-examination: "I recollect the time when Mr. Warren and Mrs. Warren came to Cypress to have a will executed. I remember the time, but I don't remember the date. It was in the morning when they got there. I don't know what time it was, but it must have been 9 or 10 o'clock, somewhere along there, as well as I remember. They came in a buggy. The first I saw of them, they were in front of the store—in front of my store. I have a sitting room or a living room in connection with my store. It is right on the side of the store—the same building. I was coming out of the store. I was either on the gallery or had just walked off when I seen them, and I was talking to Mrs. Warren. She was the first·one who spoke to me, and said good morning, and told me what they wanted—wanted me to witness a will; and asked me where Frank Peterson was, and I asked them to come into the house, and they got out of the buggy, and I told them I would go and look for Peterson, and·I went down to the saloon after him. They got out of the buggy, I think I went down to look for Peterson before they got out of the buggy, as well as I recollect. ˙ I came back from the saloon, and we went in the front room and sat down. We were right there in front of the store where I met them when Mrs. Warren said that they wanted me to witness the will. I think she was out of the buggy when she spoke to me. Mr. Warren was in the buggy. There was nothing at all passed between Mr. Warren and I. He didn't say anything to me at that time. When he came up, I bid him the time of day, he just sat in the buggy and said good morning. After we went into the house and sat down in the room they showed us the will that was drawn up that she wanted us to witness, or she asked us to witness. She showed us the paper that was drawn up; Mrs. Warren did that. Mr. Warren was sitting in a chair in the room. We

were all in the same room at the table. When she showed me the will I read it, and after I read it I asked Mr. Warren if he knew what that meant and he looked at it, and says, 'Yes,' and he says, 'I will sign it,' and reached over to the pen and signed it. He said, 'Yes; I know what it is, and I will sign it;' then we gave him the pen and ink and he signed it. I signed it. I signed it before Mr. Peterson did. That is my signature. I wouldn't remember by reading this over that it is just as I recollect it, but it is the same thing. I didn't keep no record of it. I merely read it over, and asked him if he knew what it meant, and he said, 'Yes.' He wanted to sign it, and reached for the pen and ink, and we gave him the pen and ink, and he signed it. That is the signature he made at that time. That is my signature. Peterson and I were there at the time he signed it. All of us were there when it was signed. Mr. Warren saw all of us sign it as witnesses, he was sitting right at the table, the same table where we all signed it. After we all signed the will, they got ready to go home. They didn't stay there very long after it was signed. I don't remember exactly how long they stayed there, I didn't pay no attention, but they left right shortly after it was signed. I don't remember whether I helped him in the buggy or not. We had to assist him in getting in and out of the buggy, but whether I helped him or not I couldn't say; I wouldn't be positive. I might have helped him; I think I helped Mrs. Warren assist him to get into the buggy, but I wouldn't be positive."

Both witnesses testified that Mr. Warren said no word while he was there except to return their salutations of "good morning" and to say when asked if he knew what the paper was, "Yes; I know what it is, and will sign it," or "Yes, I will sign it." The evidence of both witnesses is that deceased signed the paper in their presence, and that they signed it in his presence and in the presence of each other, and also that they did so, not at the request of Mr. Warren, but of Mrs. Warren. Mr. Warren was seated in an armed rocking chair and appeared to be very feeble. They remained only a few minutes after the will was signed, when deceased was helped into the buggy and they left. This was shown by the date of the will, October 15, 1906, and John Warren died December 4, 1907. Both Peterson and Juergen had known deceased many years and were well acquainted with him. With regard to the mental condition of deceased Juergen testified: "From my previous knowledge of Mr. Warren, my acquaintance with him, and from what I saw and heard, and all the facts in connection with the signing of the will at the time and place it was signed, I thought Mr. Warren knew what he was doing. That is the reason I asked him if he knew what that meant, and he said, 'Yes,' and I didn't have no reason to doubt his answer. In my judgment at the time, from all I know of Mr. Warren, and from what I saw and knew at the time and what transpired, in my opinion he was mentally sound—his mind was sound."

On cross-examination he testified: "I thought he was sound mentally, I couldn't say whether he was or not, but my opinion is he was sound. I gave that opinion because I thought he was of sound mind. I thought he knew what he was doing when he signed that instrument. All I had to form my opinion on was when I handed him the will and asked him if he knew what it was, he said, 'Yes; I will sign it,' that is all I had to form my opinion on. I had no conversation with him. I didn't have anything to form my opinion on except that. He did not speak until he got into the house. All he said was, 'Yes; I will sign it;' that is all I remember. I thought from what I saw and heard that he knew what he was doing. From what I knew about him I thought he was of sound mind. As to whether or not I testified in this case before that I was not willing to swear that he was of sound mind, I am not willing to swear that yet. I say I thought he was; but I could not say he was, or I could not say he was not." "I say that I thought he was of sound mind, but I couldn't swear he was or was not. I won't swear either way. I can't swear that he was of sound mind, and I can't swear he was not, but my opinion is that he was. My opinion is based upon that one thing, that he said he knew it was a will, and said, 'Yes; I will sign it'; that is about the sole thing that I rest my opinion on. I didn't have anything else to form an opinion on. I think he was of sound mind. That is my opinion; but whether he was or not I can't say. I had no reason to believe that he was not sound, and I thought he was. I did not ask him if he knew whether it was a will or not. He didn't say it was a will, and I did not tell him that it was a will. I don't know that he ever saw that paper before."

On this point the witness Schmitz testified: "I had a conversation with Mr. Warren in regard to the purchase of some land from him some time in 1906, I believe it was; it may have been in the summer or in the fall of 1906, I don't remember exactly when it was. It was after his marriage to Mrs. Warren. As to whether or not at the time I had this talk with Mr. Warren in regard to the land purchase, from his manner, his conversation, and from all that transpired, and from my previous knowledge of him whether or not he was sound in mind and capable of understanding a business transaction, I will state that I did not see anything to the contrary. I would think that he was in such a condition as that I would have done business with him if he had been willing to sell the property; I would have done business with him. I was thinking on that subject, that he was so old, but I would not have hesitated to buy from him in the condition in which he was if he had been willing to sell this property. In my best judgment he was of sound mind and

capable of understanding business transactions."

Juergen testified that he was at one time deputy tax assessor, and that deceased had each year rendered his property for taxation, but that in 1905, when he went to get his rendition, deceased told him he did not know what he had, and could not make his rendition, but he afterwards explained that deceased told him that he had had a division of his property with his children, and he did not know what he had and what his children had, and that he should see his son, John, and Peil and Ellis, and see what they had, and whatever was left belonged to him.

It was agreed that John Warren was a citizen of Harris county, and that he died December 14, 1907. By the terms of the will three several tracts of land were devised to his son, John Warren, Jr., and the remainder of his property to his wife, the proponent. The value of this land is not shown. As stated, it is alleged in the application to probate the will that his estate was of the probable value of $50,000. The will bears evidences of having been carefully written by some one having reasonable skill in such matters. The record does not show how, when or by whom, or at whose suggestion it was prepared.

[1] Article 1904, R. S. 1895, provides: "Before admitting a will to probate it must be proved to the satisfaction of the court:

"1. That the testator, at the time of executing the will, was at least twenty-one years of age, or was married, that he was of sound mind, and that he is dead.

"2. That the court has jurisdiction of his estate.

"3. That citation has been served and returned in the manner and for the length of time required by law.

"4. That the testator executed the will with the formalities and solemnities and under the circumstances required by law to make it a valid will.

"5. That such will has not been revoked by the testator."

The formalities under which a will must be executed to entitle it to probate are set out in article 5335, R. S. 1895, as follows: "Every last will and testament, except where otherwise provided by law, shall be in writing and signed by the testator or by some other person by his direction and in his presence, and shall, if not wholly written by himself, be attested by two or more credible witnesses above the age of fourteen years, subscribing their names thereto in the presence of the testator." The evidence establishes that all of these formalities were observed in the execution of this will.

[2, 3] The only issues presented by the contest are, Was the testator of sound mind at the time of the execution of the will; that is, did he possess such mental capacity as to enable him to know and understand the transaction in which he was engaged (Brown v. Mitchell, 75 Tex. 17, 12 S. W. 606; 1 Redf. on Wills, 124), and was the will his free and voluntary act, or was it the result of undue influence on the part of Mrs. Warren? 1 Redf. on Wills, 519; In re Hess' Will, 48 Minn. 504, 51 N. W. 614, 31 Am. St. Rep. 665.

[4–6] It must not be lost sight of that the case is before us upon an instructed verdict, upon the assumption by the trial court, as matter of law, that all of the evidence introduced, if true, did not present an issue for the jury, as to whether deceased was of sound mind, or whether the will was his free and voluntary act, and not brought about by what the law denominates undue influence on the part of Mrs. Warren, but that the evidence failed in some of these particulars. These issues were for the jury (Vance v. Upson, 66 Tex. 489, 1 S. W. 179), unless the evidence was of such a character that reasonable minds could not differ about it. We are not to determine, upon this appeal, whether a verdict for proponent should have been allowed to stand, but whether the evidence was sufficient to require a submission of the issues to the jury. Choate v. Ry. Co., 90 Tex. 88, 36 S. W. 247, 37 S. W. 319. There was no material conflict in the evidence, so the case presented is whether any other reasonable hypothesis upon the undisputed facts could have been arrived at by the jury than that reached by the court and carried out by the peremptory charge. So. Pac. Ry. Co. v. Vinton, 27 Tex. Civ. App. 503, 66 S. W. 483, citing cases.

[7] It is contended by appellees that a proponent of a will in a case like the present must do something more than present bare proof of the execution of the will with legal formalities, and the other requisites of the statute, but that when there are circumstances which tend to throw suspicion upon the will if unexplained, the proponent must present such explanation as will remove the suspicion, failing in which, probate should be refused. These circumstances of suspicion which should have been, and were not, explained, are set out in the motion to have the court instruct a verdict, heretofore referred to. In our opinion a jury having been impaneled to try the issues of fact, it was a question, not of law, but of fact to be decided by the jury what weight and effect should be given to these alleged circumstances of suspicion unexplained, in determining the issues as to whether the testator was of sound mind, and whether the will was his free and voluntary act or otherwise. We quite agree with appellees to this extent, that certain circumstances hanging around the execution of this will, which, as the case is to be remanded for another trial, we deem it improper for us to specifically point out; if unexplained, may properly be taken into consideration by the jury, but we cannot agree that these circumstances, and the failure of appellant to offer any explanation thereof, compel a finding by the

jury against the will upon either of the issues presented by the contest, and we do not understand that any of the cases cited by appellees, all of which we have examined, support this contention on this point in a case where a jury has been impaneled to try the facts. Appellees insist that the case of Kelly v. Settegast, 68 Tex. 13, 2 S. W. 870, is decisive of the case. The essential difference between that case and this lies in the following statement from the opinion: "The important question in this case is, did the district court err in refusing to grant a new trial based on the claim that the evidence was not sufficient to show that the paper was executed under such circumstances as to make it the last will of Hugh Kelly." The conclusion of the Supreme Court was that a new trial should have been granted, and for the refusal to do so the judgment was reversed and the cause remanded. The Supreme Court in that case places great stress upon the fact that Kelly could not read, and although it was shown that the beneficiary in the will, at the time of the signing, read out to Kelly something which purported to be the contents of the paper signed, there was no evidence that he read correctly the contents of the offered will which was signed.

Taking up now, seriatim, the several grounds of appellees' motion to have the court instruct a verdict, let us see whether the evidence was sufficient to take the case to the jury. It is alleged in the motion that appellant fails to comply with the law, imposing the burden upon her to prove the following facts before the will should be probated:

[8] (a) That there is not disclosed any fact or facts from which a knowledge of the contents of the will was imparted to the testator. If the deceased was capable of understanding anything the evidence tended to show that he knew from the conversation carried on in his immediate presence that the matter being transacted was the execution of his will. When asked if he knew what the paper there before him was he answered that he did, and that he would sign it. Would the jury be authorized to infer from this that in some way the testator had acquired a knowledge of the contents of the paper? We think there cannot be a doubt of it. There was no evidence that he could not read. He could write; presumably he could also read. It has been held that if the testator is of sound mind the mere fact of execution is prima facie evidence of knowledge of contents (Beall v. Mann, 5 Ga. 469; Boyd v. Cooke, 3 Leigh [Va.] '55); though this would probably not be so in case of a blind man, as in Boyd v. Cooke, supra, or of one who cannot read, as in Kelly v. Settegast.

[9] (b) It does not appear that deceased desired or requested the witnesses to attest the execution. In his immediate presence the statement was made that Mrs. Warren wanted Peterson and Juergen to witness the will, to which deceased made no objection, and in this immediate connection he signed himself and saw the witnesses sign. The statute does not require that the witnesses shall sign at the request of the testator, but if that were required we think that it might be inferred by a reasonable mind that deceased desired to execute the will under the formalities required by law, including the signatures of the witnesses.

[10] (c) There is not the slightest testimony that the deceased was of sound mind. Juergen, who had known him about 18 years, testified that in his opinion deceased was of sound mind, at the time of the execution of the will. It is true that he refused to swear to anything else than his opinion, but that is about all any honest witness can swear to in a matter of this kind. Surely this was sufficient to raise the issue and require it to be submitted to the jury. It was sufficient to create more than a "mere suspicion or surmise of the fact." Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059. Whether other circumstances in evidence were sufficient to overthrow the effect of the evidence of Juergen and Schmitz on this point was a question of fact and not of law.

(d) There is affirmative and strong presumption that the will is not that of the deceased, growing out of the following facts: (1) The will being in type there is no explanation offered as to who prepared it or whether it was prepared at the instance of deceased. (2) There is no evidence to account for, or explain, the unusual circumstances under which the will was made, including the trip to Cypress. (3) There is no evidence offered by proponent to show why she is made beneficiary to the exclusion of the children. (4) There is a presumption arising against the will growing out of the failure of the proponent to introduce testimony entirely within her knowledge, or to testify herself, although in court, explaining these unusual circumstances.

Granting everything here alleged, the facts stated do not do more, as claimed by appellees, than afford "affirmative and strong presumption" that the paper is not the will of deceased. Still it is a presumption of fact and not of law, and of the force and effect of such presumption and the weight to be attached to it, the jury, triers of the facts, should have been allowed to judge. Herndon v. Vick, 89 Tex. 475, 35 S. W. 141, and cases cited.

It would be improper, in view of another trial, to suggest even what weight should be attached to the circumstances set out above, and the silence of proponent when called upon, as she evidently was, to make some explanation of them, but we have no hesitation in saying that they are proper for the consideration of the jury in determining the issues, and especially the issue as

to whether the paper executed was the free and voluntary act of deceased and whether he executed it with full knowledge of its contents, but that is as far, we think, as the court would be justified in going.

We must not be understood as expressing any other opinion on the facts, except that the issues should have been submitted to the jury.

Our conclusion is that the trial court erred in instructing a verdict, and that the judgment should be reversed and the cause remanded, and it is so ordered.

Reversed and remanded.