**KVETON v. KEDING et al.**   (No. 8776.)*

(Court of Civil Appeals of Texas. Galveston. March 25, 1926. Rehearing Denied June 10, 1926.)

**1. Wills ⊚⇒302(1).**

When notary public requested attesting witnesses to come to his office to witness will, and they signed it in immediate presence of testator, evidence sustained finding that testator requested them to sign.

**2. Wills ⊚⇒111(5).**

That testator signed will before attesting witnesses must be shown to authorize its probate.

**3. Evidence ⊚⇒474(14).**

Persons knowing testator's signature are competent to testify whether signature on will produced before him is that of testator.

**4. Wills ⊚⇒289.**

Where will is proven to have been signed by testator, testator may be presumed to have signed it before attesting witnesses, though they testify that they did not notice signature.

**5. Trial ⊚⇒139(2)—Admitting testimony of nonexperts, that signatures on standards of comparison and on will were written by same person held error, and, this being only evidence of signature, instructing verdict for contestants was not error.**

Admission of testimony of nonexperts, who did not testify that they had seen testator write his name, nor that they knew his signature, that from comparison they believed that signature on lost will and signatures on standards of comparison were written by same person, held error, and, this being the only evidence that will was signed by testator, instructing verdict for contestants was not error.

**6. Evidence ⊚⇒197, 564(2)—Irrelevant papers are not admissible to furnish standard of comparison of handwriting, unless admitted to be genuine, or unless party charged with their execution is estopped to deny their execution, or their execution is established by most satisfactory proof.**

Irrelevant papers are not admissible to furnish standard of comparison of handwriting, unless admitted to be genuine, or unless party charged with their execution is estopped to deny their execution, or their execution is established by most satisfactory proof, such as testimony that witness saw party charged with execution sign them, or that said party admitted to him that he signed them.

**7. Wills ⊚⇒295.**

Unless signature on will is produced in court, proof of it cannot be made by comparison.

**8. Wills ⊚⇒337.**

Where contestants denied signature to will, and the standards of comparison were introduced in evidence, but will was not found until one hour after judgment, refusing new trial was reversible error.

**On Motion for Rehearing.**

**9. Wills ⊚⇒337.**

Where due diligence was exercised to discover will, and evidence would reasonably lead to conclusion of its destruction or permanent loss, failure to move for continuance held not to prevent appellant from being granted new trial on its subsequent discovery.

**10. Wills ⊚⇒322.**

Testimony admissible only to rebut undue influence in execution of will should be excluded, if contestants offer no evidence to support plea of undue influence.

**11. Wills ⊚⇒293(2)—Testimony that, after execution of will, testator had witness read it to him, and said, "That is the way I wanted it to go," held admissible as showing testator understood will and acquiesced in signing by witnesses.**

Testimony that three or more years after execution of will testator had witness read will to him, and stated, "That is the way I wanted it to go," held admissible as a circumstance surrounding testator at execution of will to show that he understood it was prepared as his will, and that witnesses signed it as witnesses, and that he acquiesced in their acts.

**12. Appeal and error ⊚⇒1006(1).**

Appellate court is not concerned with the number of times that cause has been tried nor causes necessitating such trials.

Appeal from District Court, Austin County; M. C. Jeffrey, Judge.

Application by Frank Kveton for the probate of the will of John Kveton, Sr., deceased. From a decree in favor of the contestants, Johanna Keding and another, denying the probate, proponent appeals, and contestants file cross-assignments of error. Reversed and remanded.

C. G. Krueger, of Bellville, and C. C. Glenn, of Sealy, for appellant.

C. H. Chernosky, of Houston, and Johnson, Matthaei & Thompson, of Bellville, for appellees.

LANE, J. In September, 1920, appellant Frank Kveton filed his application in the county court of Austin county praying for the probate of a will alleged to be the will of his father, John Kveton, Sr.

Appellees contested said application, and, upon a hearing in the county court, the probate of the will was refused. From such judgment of refusal proponent, Frank Kveton, appealed to the district court. Upon a hearing in the district court, judgment was rendered probating the will, and upon appeal from such judgment this court reversed the same and remanded the cause. Keding et al. v. Kveton, 254 S. W. 612.

After the cause had been remanded for trial by the district court, proponent filed a supplemental plea in which he alleged that the

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

286 S.W.—43   *Writ of error dismissed for want of jurisdiction November 3, 1926.

original will had been lost since it was first filed for probate, and filed an agreed copy thereof in lieu of the original.

Contestants denied that the will offered for probate was the will of John Kveton, Sr., deceased, and alleged that, if it be shown that deceased did execute the same, he did so when old and while feeble in mind and body, and that proponent, Frank Kveton, took advantage of such conditions, and unduly influenced him to execute the same, and that the will was not, therefore, the will of John Kveton, Sr., but was the will of proponent, Frank Kveton, the principal beneficiary under the will as written. They denied that the will was executed by John Kveton, Sr., at all, but say that, if it was, it was not executed in manner and form so as to constitute it a lawful will.

On the 12th day of January, 1925, the cause again came on for trial in the district court, and, after the proponent had introduced his evidence, the court, upon motion of contestants, instructed a verdict for contestants. Such verdict was returned, and judgment was rendered, refusing the probate of the will. Proponent has appealed.

The issues presented on appeal are, first, did John Kveton, Sr., sign the will offered for probate? Second, did the purported attesting witnesses sign the same at the request of John Kveton, and, if so, had the will at such time been signed by him or by some one authorized by him to sign the same for him?

Appellant takes the position that the evidence was such as should have required the trial judge to submit the issues named to the jury, and that his refusal so to do and his act in instructing a verdict for appellees were such errors as should cause a reversal of the judgment.

The will offered for probate was as follows:

"We, the undersigned John Kveton and wife Anna Kveton of Austin county, Texas, being of sound mind and memory and understanding, do hereby make our last will and testament in manner and form as follows:

"It is our will and we decide, that the survivor of us shall remain in full possession of all our property, both real and personal, whatsoever and wheresoever it may be, and after the death of both of us, our son Frank Kveton shall receive all of our present farm, consisting of 264 acres of land, our present homestead, with improvements thereon, situated on Bernardo prairie in Austin county, Texas. He shall be the sole owner of said farm, after paying his sisters, our daughters Johanna Keding, née Kveton, wife of August Keding, and Josephine Lux, wife of Ferdinand Lux, both of Austin county, Texas, the sum of ($300.00) three hundred dollars each.

"It is our will and we decide, that our balance of our personal property, whatsoever and wheresoever it may be, be divided among our above named three children, share and share alike, after all funeral expenses for both of us have been paid.

"We hereby appoint our son Frank Kveton and our son-in-law, Ferdinand Lux, executors of this our last will and testament without bond, revoking all other wills heretofore made by us.

"Witness our hands this the 19th day of February, A. D. 1914.

"John Kveton, Sen.
her
"Anna X Kveton.
mark

"Signed and declared by the said John Kveton and his wife Anna Kveton as and for their last will and testament, in the presence of us, who at their request and in their presence and in the presence of each other, have hereunto subscribed our names as witness.

"Sealy, Tex., February 19, A. D. 1914.
"Aug. Iselt.
"Otto Kohllefel."

[1] It was shown that at the time of the trial A. Ludwig, a notary public, who drafted the instrument offered for probate as the will of John Kveton, was dead; that on the 19th day of February, 1914, A. Ludwig, who drew the instrument, went to a house 33 steps from his residence, which was being built by August Iselt and Otto Kohllefel, and told said parties that Mr. and Mrs. Kveton were making a will, and that they had to have two witnesses, and requested the parties to go to his office, which was in his dwelling house, and sign the will as witnesses; that such request was made in the German language in an ordinary tone of voice; said parties went to Ludwig's office, and there they found John Kveton, Sr., and wife sitting in said office; that the paper purporting to be the will of Kveton and wife was lying on the table a short distance only from where Kveton and wife were sitting, both of whom possessed the faculties of sight and hearing usually possessed by people of their age, they being about 70 years of age; that, when said parties entered said office, they bid Kveton and wife "good morning" or "good evening"; that neither Kveton or wife told them that the instrument was their will, nor requested them to sign as attesting witnesses, nor did they say anything to said parties with reference to said instrument.

Under the circumstances above stated, both of said parties signed the instrument as attesting witnesses. At the last trial it was shown that the witness August Iselt was dead, and his testimony given upon a former trial was introduced in evidence. The substance of that testimony, material to the issues, is as follows:

"We were building a house for Mr. Ludwig in Sealy. We were both carpenters, doing carpenter work. Mr. Ludwig came over there, and wanted us to sign a will. That is what he told us. We went over to his house, and signed it. When we got over there to his house, he did not read the instrument over to us, and I do not know what it was. I signed the instrument there, but I don't know whether Mr. Kveton signed it or not. I did not see him sign it. Mr. Kveton did not ask me to sign

the instrument. He did not say anything to me.

"I did not know what the paper was only Mr. Ludwig told us to sign a will for them as witnesses. He did not say just at the moment we signed it was their will, but he told us it was their will, Mr. Ludwig did. He did not tell us in the house; he told us out there where we were at work that it was their will —that is where Mr. Ludwig told us. He told us out at the house where we were building, which was about as far from the house as from here to across the street.

"I did not speak to John Kveton at all in the house except to say good morning or good day or something like that, and that is all he said to me. I said that we went in there to sign a will for John Kveton and his wife. At that time I did not know who the woman was. I might have seen her before, but I never was introduced to her, and I could not tell; I did not know her. * * *

"We simply signed the paper that Mr. Ludwig handed to me; signed that, and we then went back to work; that is right. When going back, I told Mr. Kohllefel that that was the first paper that I ever signed without knowing what it was—that we ought to have had him read it.

"When I said I did not know what it was, I mean I did not know what the instrument contained, because I did not read it, and he did not read it to us. I know what he said it was, but I did not know what I had signed."

The other subscribing witness, Otto Kohllefel, testified in part as follows:

"August Iselt and I were at work for Ludwig on a house; that house was located about 33 steps from the house I afterwards went to to sign the paper. I was putting the weather boarding of the house on the front or Main street in front of the house. The front of the house was facing southwest. Mr. Ludwig came out there, and said Mr. John Kveton and Mrs. Kveton were making a will, and had to have two witnesses, and wanted to know whether we would witness it. That said statement was made by Ludwig while we were at work, and where we were at work. Iselt and Ludwig and I then went to Mr. Ludwig's house, where he had a little room. When we walked in there, the old man and old woman were sitting by the side of a table. When we walked in, we said either good morning or good evening, I don't remember which. Mr. Kveton never told me it was his will. Mr. Ludwig did. Mrs. Kveton did not tell me it was her will. Mr. Kveton did not ask me to sign the paper, and Mrs. Kveton did not ask me to sign it. The only person who asked me to sign it was Mr. Ludwig. Mr. Ludwig asked me out there where I was building the house to come in and sign it, out there where we were at work.

"I don't remember whether the paper was lying open or folded. I did not see Kveton's name signed to that paper at the time I signed it. I could not tell whether old man Kveton's name was signed to it. I could not tell whether it was or not. Iselt was there with me, standing by my side. We were right together. When Iselt and I signed our names, we went back to work.

"I don't know whether Ludwig ever read that over to old man Kveton and wife or not. I could not say of my own knowledge whether old man Kveton knew that was a will. I don't know of my own knowledge whether old man Kveton knew what was in that paper."

Testifying further, he said:

"When we got into the office, Mr. Ludwig picked up the paper and said, 'I will read this to you before you sign it.' As to whether he read the whole paper, he did read part of it, I don't know how much. I do not now remember whether 'Signed and declared by the said John Kveton and his wife Anna Kveton as and for their last will and testament, and in the presence of us, at their request, and in their presence, and in the presence of each other, have hereunto subscribed our names as witnesses. Sealy, Tex. February 19, 1914,' was the part he read. As near as I remember, he read the lower part.

"I testified in this case before. As to my testifying before that he read that part of the will, and as to whether that is correct, it was the lower part, as well as I remember. I could not now remember whether or not it was that part you have just read; I don't know whether it was that part or not. I am sure he read part of it. I knew I signed a will. It was the will of Mr. John Kveton and Mrs. John Kveton. No one else signed except I and August Iselt. August Iselt saw me sign it; I saw August Iselt sign it. When I signed it, Mr. and Mrs. John Kveton were two or three feet to the side of us. I expect that John Kveton and his wife and August Iselt saw me sign it. They were there looking at us. I signed the will after Mr. Ludwig read a part of it to me. When I came in Mr. and Mrs. John Kveton were pleasant to me. Neither Mr. nor Mrs. Kveton objected to my signing the will.

"John Kveton at that time was of sound mind and memory. I did not see anything wrong with him. I saw that paper since I signed it. I saw it at Bellville. It was the same paper that I signed. It was the same paper offered for probate. It was the same paper that Iselt and I signed, and I saw it in Bellville. When we signed, it was handwriting. I don't know what the body of the will was, whether handwriting or typewriting."

On cross-examination he said:

"Ludwig read some part of the will to us, or some part of that paper; I don't know what part he read; he just held it up in front and read. I think he read some of the lower part. He read that paper in English. He showed us where to sign our names. I did not see old man Kveton sign anything. I don't remember whether the paper was lying open or folded. It was something like that—all the bottom part was open. I did not see Kveton's name signed to that paper at the time I signed it; it was just about like that (about a third folded over). I could not tell whether old man Kveton's name was signed to it. I could not tell whether it was or not. As to whether I could have seen it signed at the bottom, if it was signed, I was not looking for it. I saw when Ludwig held up and read part. I could not tell whether it was signed then by old man Kveton or not.

"Iselt was there with me, standing by my side. We were right there close together.

When Iselt and I signed our names, we went back to work. We told the old folks good-bye—just told them good-bye. Good-bye is all they said to us.

"I don't know whether Ludwig ever read that to old man Kveton and his wife or not. I could not say of my own knowledge whether old man Kveton knew that was a will. I don't know of my own knowledge whether old man Kveton knew what was in that paper."

On redirect examination he said:

"I also know what Ludwig told me about the paper when he read it to me. When he read a part, he said something about a will and testament of John Kveton. He read a part—that latter part of the will. When I signed the paper, I knew that it was the last will and testament of Mrs. John Kveton and John Kveton. Mr. Ludwig said it was his will."

We think the facts and circumstances above stated are sufficient to support a finding that John Kveton desired to execute the will signed by Kohllefel and Iselt under the formalities required by law, and that it was in fact his request that they should so sign, though he did not in person make such request directly to the parties.

By article 7857 of our Civil Statutes it is provided that—

"Every last will and testament, except where otherwise provided by law, shall be in writing and signed by the testator or by some other person by his direction and in his presence, and shall, if not wholly written by himself, be attested by two or more credible witnesses above the age of fourteen years, subscribing their names thereto in the presence of the testator."

It will be observed that a request by the testator to the witnesses to sign is not one of the requisites expressly prescribed by law for the making of a will. In 40 Cyc. 1115 and 1116, it is said:

"Statutes sometimes require attestation at the request of the testator. And although the statute does not require a request, it seems to be implied in the meaning of the word 'attest' that it shall be at the testator's request which may be implied from all the circumstances. No formal request is necessary. It is not material how the request is conveyed to the witnesses so long as it appears that the request was the free and intelligent act of the testator. It may be implied from the acts or conduct of the testator and from the attendant circumstances, or by asking that the witnesses be sent for to attest the execution or by assent to their signing, by affirmative response to a question as to whether the testator wanted the will attested, or by the reading of the attestation clause in the testator's presence after signing by the witnesses. So a request may be implied by acquiescence in the request of another that the will be signed. Such request may be made by any person so long as the testator acquiesces or approves of it, or by his conduct such acquiescence or approval can be implied."

In 1 Shouler on Wills (6th Ed.) p. 583, § 512, it is said:

"The request that witnesses should attest and subscribe one's will may be inferred from acts and conduct of the testator as well as his express words; the law regarding substance rather than literal form in such matters. It is not essential, therefore, that the testator should expressly ask the subscribing witness to attest his will. His acts, his gestures, may signify this request, whatever, in fact, implies his knowledge and free assent thereto. Indeed, the active part in procuring the witnesses and requesting them to attest and subscribe is not unfrequently borne by some friend, near relative, or professional counsel; and, if such third person acts truly for the testator in his conscious presence, and with his apparent consent, the legal effect is the same as though the testator himself had spoken and directed the business."

The rule above stated is also stated in Gardner on Wills, at page 221.

It has been held by the courts of several states, with statutes similar to ours, that an act or motion indicating acquiescence is unnecessary, where the attestation is made in the presence of the testator, and he knows that the witnesses are signing in response to a request made by some one other than himself, and makes no objection. Warren v. Ellis (Tex. Civ. App.) 137 S. W. 1182; In re Hull, 117 Iowa, 738, 89 N. W. 979; In re Nelson, 141 N. Y. 152, 36 N. E. 3; Gilbert v. Knox, 52 N. Y. 125; Peck v. Cary, 27 N. Y. 9, 84 Am. Dec. 220.

[2-4] It is clear, from what has been said, that, if the trial judge instructed a verdict for contestants solely upon the assumption that it was not shown that the witnesses signed the will at the request of John Kveton, such assumption was error, and the judgment should be reversed, but we would not be justified in concluding that the instruction was given on any such assumption. The mere proof that the parties who signed the instrument, which they had been told was the will of John Kveton, who desired them to sign as attesting witnesses, together with his assent and acquiescence to such signing, would not meet the requisites prescribed by law for the making of wills in this state. To authorize the probate of the instrument as the will of John Kveton it must be shown that he had signed the instrument before the witnesses signed to attest such signature. If no such showing has been made by competent evidence, the court properly instructed a verdict for the contestants. Was such showing made? We think not.

Gerhardt Borgel testified that he was a banker, and had been with the Citizens' State Bank of Sealy for twelve years; that John Kveton, Sr., deceased, did business with his bank; that he deposited money in his bank; that he had known Kveton for at least five years; that Kveton did not write a very legible hand, but that he believed he was familiar with his handwriting; that he saw him write, and that he had occasion to han-

dle his writing in the capacity as cashier of his bank; that he knew Kveton's signature; that the signatures on certain certificates of deposit introduced in evidence were the genuine signatures of John Kveton.

Quite a number of certificates of deposit, identified by Gerhardt Borgel as having been signed by John Kveton, were introduced in evidence as standards of comparison with the signature on the purported will, for the purpose of proving by comparison that the signature purporting to be the signature of John Kveton on the will was in fact his signature.

There was also introduced in evidence, to be used as a standard of comparison, a certain bill of sale which bore the purported signature of the deceased, John Kveton. The signature to such bill of sale as the signature of the deceased was shown by the undisputed testimony of one Joe Kveton, who testified that he saw the deceased sign the same.

There can be no doubt that persons who knew the signature of John Kveton, such as Borgel, are competent witnesses to testify that the signature on the will, if produced before him, is or is not the genuine signature of John Kveton, nor can it be doubted, we think, that, had it been shown by two such persons that they had examined the purported will before its disappearance, and that, from their familiarity with, and knowledge of, the signature of John Kveton, the signature on the purported will was the signature of Kveton, such showing would have been sufficient to carry the issue as to whether the will in fact bore the signature of Kveton, to the jury. Had it been shown by competent evidence that the purported will was in fact signed by John Kveton, it may be presumed that his signature was on the will at the time it was subscribed by the attesting witnesses, though they testified that they failed to notice such signature if it was there at the time they signed as witnesses. Hobart v. Hobart, 154 Ill. 610, 39 N. E. 581, 45 Am. St. Rep. 151; Gould v. Chicago Theological Sem. et al., 189 Ill. 282, 59 N. E. 536.

In the case first cited it is said:

Where "there is proof that the signature to the will produced is" the testator's "and that the two subscribing witnesses signed the attestation clause in his presence, * * * a prima facie case is made in favor of the due execution of the will, and this prima facie case is not overcome by the mere fact that the subscribing witness * * * testifying failed to notice whether the will was signed or not and cannot remember whether she saw the signature or not."

And in the other case it is said:

"It was shown that" the testator's "signature was genuine, and that the attesting witnesses signed the attestation clause at his request and in his presence. *Held* sufficient to show that his signature was on the instrument at the time it was subscribed by the attesting witnesses, though they testified that they failed to notice it."

[5] But, while the rule announced by the authorities from which we have quoted seems to be the uniform holding of all the courts, we have no competent evidence in this case tending to show that the will offered for probate bore the signature of John Kveton. Neither Johnson, Matthaei, Stierling, nor Batla qualified as experts on handwritings, and no one of them testified that they had ever seen John Kveton write his name or that they knew his signature. They were permitted, however, over the objection of counsel for contestants, to testify that they had seen the signature on the last will purporting to be that of John Kveton, and had, before the disappearance of said will, compared the signature thereon with the signatures on the instruments introduced as standards of comparison, and that from such comparison they then thought that the signatures on such instruments and that on the last will were written by the same person, and that from their recollection of the characteristics of the signature on the will they believed, when testifying, that it was written by the same party who wrote the name of John Kveton on the instruments introduced as standards of comparison.

This testimony, we think, was clearly inadmissible, and therefore the court erred in admitting the same over the objection of contestants, and the court was therefore not in error in holding that it was insufficient to carry the issue to the jury as to whether John Kveton had signed the will or not, and, as the witnesses last mentioned were the only witnesses whose testimony remotely tended to prove that the signature on the will was the genuine or true signature of John Kveton, it was not shown that he had signed the will at any time, and under such circumstances the court properly instructed a verdict for contestants.

[6-8] We are now brought to a consideration of appellant's contention that the court erred in not granting his motion for a new trial, based upon the ground of newly discovered evidence.

It was shown that the will of John Kveton offered for probate was filed in court when the first application for its probate was filed; that it was before the court at all trials of the cause prior to the last one; that at the time the cause was called for trial the last time it had disappeared from among the papers in the cause, and could not be found, though diligent search had been made therefor, before and during the trial, in every place where it might probably be found, by counsel for both parties and by the district clerk.

Judgment was rendered on the 12th day of January, 1925, refusing the probate of the will. Appellant filed his original motion for a new trial on the 13th of said month and his amended verified motion for new trial on the 22d of said month. Appellant alleged as

a ground for new trial substantially that in about one hour after the rendition of the judgment the will originally filed and offered for probate as the will of John Kveton was found with the papers in the cause; that it was not, just before or during the progress of the trial, with said papers; that diligent search had been made for said will before the trial began and during its progress, and that it could not be found; and that appellant, without fault on his part, had been deprived of the use of said will as evidence in the trial of the cause. He alleged that such evidence was very material for the proper determination of whether the will offered for probate was signed by John Kveton, in that the signature on the will purporting to be the will of John Kveton might be examined by witnesses and the jury in determining whether it bore the signature of John Kveton, and, if so, whether it was signed by John Kveton before the attesting witnesses had signed.

The material facts alleged in the motion as to the loss of the will, the search made therefor, and that it was found among the papers soon after the rendition of the judgment, are supported by all the evidence offered in support of the motion for new trial.

That the will would furnish a material fact in the trial of the cause we think there can be no doubt. The witness Borgel had testified that he saw John Kveton, deceased, sign the several certificates of deposit introduced in evidence as standards of comparison, to be used as such in determining whether the name of John Kveton on the will was written by John Kveton. There was also introduced in evidence for the same purpose a certain bill of sale, which the witness Joe Kveton testified that John Kveton had signed; that he saw him sign it. These papers were properly before the court as standards of comparison. It is the rule in this state that irrelevant papers are not admissible in evidence for the sole purpose of furnishing a standard of comparison of handwriting, unless they are admitted to be genuine, or are such as the party charged with the execution of them is estopped to deny that he had in fact executed them, or are such as are established by the most satisfactory proof, such as the testimony of a person to the effect that he saw the party charged with the execution sign them, or that said party admitted to him that he had signed them. Mardes v. Meyers, 8 Tex. Civ. App. 542, 28 S. W. 693; Cannon v. Sweet (Tex. Civ. App.) 28 S. W. 718; Williams v. State, 27 Tex. App. 466, 11 S. W. 481; Barnes v. Barnes (Tex. Civ. App.) 261 S. W. 485; Cowboy State Bank & Trust Co. v. Roy (Tex. Civ. App.) 174 S. W. 647.

In Mugge v. Adams, 76 Tex. 448, 13 S. W. 330, and Robertson v. Talmadge (Tex. Civ. App.) 174 S. W. 627, it is held that a signature cannot be proven by comparison when the signature is not before the court.

From the rules established by the cases cited, it is manifest, first, that, had the will been produced in court, experts as to handwritings could have been permitted to testify, by comparing the standards introduced in evidence with the name of John Kveton on the will, that the standards were or were not written by the same person; and, second, that, unless the signature on the will was produced in court, such proof could not be made by comparison. It is therefore evident that the production of the will in court might have been very material in establishing that John Kveton has signed the same.

For the reasons stated, we think the court should have granted the motion for new trial, and that his refusal so to do is cause for a reversal of the judgment.

We now come to a consideration of the cross-assignments of appellees.

What we have said disposes of all of such assignments, except one, whereby insistence is made that the court erred in permitting the witness Batla to testify that some three years or more after the date of the purported will John Kveton gave him the will in question, and had him to read and explain the same to him, Kveton; that, after he read the will and explained it, John Kveton said, "That is the way I wanted it to go," or something to that effect.

We think that, since appellees had alleged that the will was not the will of John Kveton, but the will of Frank Kveton, who exercised undue influence over John Kveton in procuring its execution, thus raising such issue, the testimony objected to was admissible as tending to disprove such allegation.

Having reached the conclusion that the court committed reversible error in refusing to grant appellant's motion for new trial, it becomes our duty to reverse the judgment and remand the cause, and it is so ordered.

Reversed and remanded.

### On Motion for Rehearing.

[9] This court having reversed the judgment rendered by the trial court in favor of contestants, appellees here, and having remanded the cause, contestants have filed this motion for rehearing. As a basis for such motion, they contend, among other things, first, that this court erred in holding that the trial court should have granted appellant's motion for new trial upon the allegation of newly discovered evidence, to wit, the will of John Kveton, which was the will being offered for probate, and which he alleged could not be found before the termination of the trial, and that by reason of the refusal to grant such new trial the court abused his discretion. Because it is made to appear that appellant failed to exercise that degree of diligence to discover said will before going to trial, and because, had such diligence

been exercised and the will not found, appellant should have moved for a continuance to the end that he might procure said will before being forced to trial, and that, as appellant failed to move for such continuance, and having voluntarily gone to trial without the presence of the will, he was not entitled to a new trial as a matter of law; and, second, that this court erred in holding that the testimony of the witness Ed Batla to the effect that John Kveton, deceased, came to his office some three or more years after the time of the execution of Kveton's will, and had him (Batla) read and explain said will to him (Kveton) in the Bohemian language, as Kveton was a Bohemian, and that he, upon such request, read and explained to Kveton the will in the Bohemian language, and that after so doing John Kveton said to him: "That is the way I wanted it to go," or something to that effect, was admissible upon the issue of undue influence, made by appellees' pleadings, in that appellees made no attempt to prove such plea, and therefore the testimony objected to being admissible only as rebuttal evidence was erroneously admitted.

We do not think we should grant appellees' motion for rehearing upon either of such grounds. We think the undisputed evidence shows that counsel for appellant had exercised due diligence to discover the will of Kveton before announcing ready for trial; that the evidence with reference to the disappearance of the will at the time of the trial, and the efforts put forth to find the same, was such as would reasonably lead to the conclusion that it had been destroyed or permanently lost, and that there was no reasonable expectation that it could be produced at a subsequent trial. Under such circumstances proponent, appellant here, was unable to make oath that, if the cause be continued, he had an expectation to produce the will at a subsequent term of court.

[10, 11] We now come to a consideration of the second ground stated. We agree with appellees that, if the testimony of Batla, above stated, was admissible only as tending to rebut the plea of undue influence, it should have been excluded, as contestants offered no evidence tending to support their plea of undue influence. While it is true that it appears that the only objection urged to the admission of the testimony was that it would be admissible only as rebuttal evidence to rebut evidence in the event any was offered to support the plea of undue influence, and while it is true that we passed only upon the objection urged, we now, after the question of its admissibility has again been raised, conclude that the testimony was admissible as a circumstance among other circumstances surrounding John Kveton at the time of the execution of the will to show that he understood at the time of such execution that the will was prepared by Ludwig, the scrivener, as his will, and that the two witnesses were signing the same as witnesses, and that he acquiesced in the acts so done by said parties.

[12] In conclusion, counsel who prepared the motion for rehearing says that the case has been tried four times already, and then asks: "How many times do they want? How many is the court going to give them?" To the last question we answer: In passing on the issues presented by this appeal, we have carefully considered the record of the proceedings had at the trial which resulted in the judgment from which this appeal was taken, and none other. We are not concerned as to how many times the cause has been tried, nor the causes necessitating such trials. We are reversing the present judgment, from which this appeal was taken, because we have reached the conclusion that the trial court committed reversible error, as pointed out in our opinion.

Having made the foregoing explanation, we overrule the motion.

Overruled.